483 A.2d 1255

**Michael Anthony FERGUSON**

v.

**STATE of Maryland.**

**No. 72, Sept. Term, 1983.**

Court of Appeals of Maryland.

Nov. 27, 1984.

---

**6.** *See* n. 3, *supra.*

544

Julia A. Doyle, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Alice G. Pinderhughes, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ.

COLE, Judge.

We are called upon in this case to determine whether the trial court erred in not suppressing the extrajudicial identification of the defendant as the fruit of an illegal arrest.

---

* Davidson, J., participated in the hearing of the case and in the conference in regard to its decision, but died prior to the adoption of the opinion by the Court.

We recite the facts stipulated by the parties. In the early afternoon on October 22, 1982, three men accosted Clarence Welsh, a delivery truck driver for United Parcel Service, at gunpoint as he was completing his deliveries in the 1800 block of Fulton Avenue in Baltimore City. The men forced Welsh into the rear of the truck, where one man held a pistol flush to his head while another combed Welsh's pockets, taking his keys, wallet, and watch. Near the end of this seven minute ordeal, the gunman pulled the trigger three times but the pistol failed to fire. Welsh immediately struggled with the gunman, and the gun discharged once. The trio then fled and Welsh, who was shaken but uninjured, summoned police.

At the time of the robbery Officer Kirk Montague was in a patrol vehicle approximately one block away. Officer Montague testified that he heard what sounded like the report of a gunshot, and about fifteen seconds later saw two men running past him on Fulton Avenue. Officer Montague apprehended the defendant, Michael A. Ferguson, after a short chase. A subsequent search of Ferguson uncovered Welsh's keys, watch, and wallet. After bringing Ferguson back to the police vehicle, Officer Montague heard a police radio bulletin that a robbery had just occurred in the 1800 block of Fulton Avenue. Officer Montague then transported Ferguson to the Western District police station.

Meanwhile, police who had responded to Welsh's call took him to the same police station. Officer Montague conducted a showup in Ferguson's holding cell approximately twenty minutes after the arrest, and Welsh positively identified Ferguson as one of his assailants. Indeed, the description Welsh gave of Ferguson at the robbery scene matched Ferguson: a stocky, young black male with a thin beard and a green knit-cap.

At a bench trial in the Circuit Court for Baltimore City, the State sought to introduce the items seized from Ferguson's person at the time of his arrest, and Welsh's extrajudi-

cial and in-court identification testimony, all subject to Ferguson's suppression motion. The trial court concluded that Ferguson's arrest was illegal because Officer Montague did not have probable cause to arrest Ferguson. As a result, the trial court suppressed the physical evidence. The trial court, however, ruled that the identification testimony was admissible. Ferguson was subsequently convicted of robbery with a deadly weapon and related offenses.[1]

On appeal, Ferguson contended that the trial court erred in not suppressing the identification testimony as the fruit of an illegal arrest. In an unreported per curiam opinion filed April 4, 1983, the Court of Special Appeals did not address this argument, but instead affirmed the trial court's rulings on the basis that the identifications were not suggestive. We granted certiorari to consider the issue presented.

## I

■ The disposition of this case necessarily turns on the application of the "fruit of the poisonous tree" doctrine,[2] which requires courts to suppress evidence as the product of unlawful governmental activity. This doctrine, which

---

**1.** Ferguson was also convicted of assault with intent to murder and use of a handgun in the commission of a crime of violence. Ferguson received twenty-year sentences for the robbery and aggravated assault convictions, and a fifteen year sentence for the handgun offense, all three sentences to run concurrently.

**2.** This doctrine is an aspect of the exclusionary rule, a judicially-imposed sanction for violations of the fourth amendment right against unreasonable searches and seizures in state prosecutions. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Court of Special Appeals, however, disposed of this case on due process grounds. This analytical approach misses the point because it fails to address the distinct fourth amendment violation and consequent issues raised by Ferguson. We note that although at one time we considered the fruits of the poisonous tree doctrine inapplicable in state prosecutions, *see Mefford v. State,* 235 Md. 497, 201 A.2d 824 (1964) (5–2 decision), *cert. denied sub nom. Blackburn v. Maryland,* 380 U.S. 937, 85 S.Ct. 944, 13 L.Ed.2d 825 (1965), we have since held that this doctrine is applicable in Maryland. *Everhart v. State,* 274 Md. 459, 337 A.2d 100 (1975).

derived its descriptive title from *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939), had its genesis in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), where the Supreme Court held that the exclusionary rule applied to incriminating evidence derived from the primary evidence. Over four decades later the Court extended the exclusionary rule to evidence that was the indirect product or "fruit" of police conduct in violation of the fourth amendment. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Under *Wong Sun,* the question to be resolved concerning the admissibility of derivative evidence is whether such evidence was " 'come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (quoting J. Maguire, *Evidence of Guilt* 221 (1959)). This standard reflects a deterrence-based policy, which is "[t]he core rationale consistently advanced ... for extending the Exclusionary Rule to evidence that is the fruit of unlawful police conduct ...." *Nix v. Williams,* 468 U.S. ——, ——, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377, 386–87 (1984). Despite the high societal costs in allowing persons obviously guilty to go unpunished for their crimes, *see id.,* the Court in *Wong Sun* reasoned that suppression was the appropriate remedy so as to deter police from exploiting their illegal conduct. *Wong Sun v. United States, supra,* 371 U.S. at 484–85, 83 S.Ct. at 416, 9 L.Ed.2d at 454.

Supreme Court decisions subsequent to *Wong Sun* have focused upon the attenuation aspect of *Wong Sun,* i.e., at what point does the nexus between the fourth amendment violation and the discovery of the challenged evidence become so attenuated as to dissipate the taint of the primary illegality. A 1975 decision by the Supreme Court, *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), is instructive on the attenuation issue. Factually, police arrested the accused without probable cause and without a warrant. After police gave him the warnings set forth in

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Brown made two in-custody inculpatory statements. The trial court refused to suppress these statements, and Brown was convicted of murder. On appeal, the Supreme Court of Illinois determined that the giving of the *Miranda* warnings "served to break the causal connection between the illegal arrest and . . . the statements." *People v. Brown,* 56 Ill.2d 312, 317, 307 N.E.2d 356, 358 (1974). The United States Supreme Court reversed, *Brown v. Illinois, supra,* holding that the lower courts erred in adopting a *per se* rule that *Miranda* warnings, standing alone, purged the taint of an unlawful arrest and rendered post-arrest statements admissible. In writing for the *Brown* Court, Justice Blackmun declined to adopt a "but for" rule that would render inadmissible all statements given subsequent to an illegal arrest. Rather, the Court adopted a case-by-case approach to determine whether evidence obtained after an illegal arrest has been purged of the taint of that illegality. In addition to the giving of *Miranda* warnings, the *Brown* Court identified three "relevant" factors in ascertaining whether a confession is obtained by the exploitation of an illegal arrest: (1) the "temporal proximity" of the illegality and the evidence; (2) "the presence of intervening circumstances" and (3) "particularly, the purpose and flagrancy of the official misconduct." *Id.* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427 (footnote omitted). These factors focus upon the causal relationship between the primary illegality (such as illegal arrest) and the evidence derived from this illegal conduct, and the actual purpose of the officer's illegal arrest.

We recognize that *Brown* did not deal in express terms with the precise issue in the case *sub judice,* which is whether extrajudicial identification testimony is suppressible as the fruit of an illegal arrest. Despite this difference, we find no impediment in applying the *Brown* attenuation analysis to determine the admissibility of this identification testimony. *See* 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4, at 657 (1978)

(urging courts to apply "essentially the same [analysis] as that used" by *Brown* in determining the attenuation between an illegal arrest and an extrajudicial identification); *cf. United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (applying other "elements" to determine whether an in-court identification has a source independent of an unlawful extrajudicial identification).

The temporal proximity attenuator involves the issue of lapsed time. Although this factor intimates that the likelihood that the taint has been purged increases in proportion to the time that has elapsed between the unlawful conduct and the evidence derived therefrom, the Supreme Court has understandably not articulated any mathematically precise test for determining at what point the taint has been purged by the lapse of time. Recent decisions, however, indicate that time spans ranging from two hours to six hours between an unlawful arrest and the challenged evidence constitute insufficient attenuation. *See Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (six hours); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (two hours). Because a lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention, the temporal proximity factor has been labeled "ambiguous," *id.* at 220, 99 S.Ct. at 2260–61, 60 L.Ed.2d at 841 (Stevens, J., concurring), and "relatively unimportant," W. LaFave, *supra*, § 11.4, at 657. In any event, the extrajudicial identification in the case *sub judice* occurred within twenty minutes after the illegal arrest. The State urges that this factor be assigned little weight because the victim "took the time to go to the police station." We fail to see how this reasoning is relevant to the temporal proximity factor. Consequently, given the admittedly short time span of no more that twenty minutes, we conclude that this particular factor weighs in favor of suppression.

With respect to the intervening circumstances factor, the State offers two reasons as to why the taint was

dissipated by this factor: (1) the victim was transported to the police station; and (2) the victim was able to identify his assailant at the showup. These reasons are unpersuasive. As an initial matter, an intervening circumstance is an event that breaks the causal connection between the unlawful conduct and the derivative evidence. Properly considered, the focus should more appropriately be on the accused to determine whether there was any event that contributed to his ability to consider carefully and objectively his options and to exercise his free will. *Taylor v. Alabama, supra,* 457 U.S. at 691, 102 S.Ct. at 2668, 73 L.Ed.2d at 320. A case involving an intervening circumstance is *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). The *Johnson* Court refused to suppress a lineup identification conducted after an unlawful arrest because, prior to the lineup, the accused was committed by a magistrate. As a result, "the lineup was conducted not by 'exploitation' of the challenged arrest but 'by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* at 365, 92 S.Ct. at 1626, 32 L.Ed.2d at 161 (quoting *Wong Sun v. United States, supra,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455). By contrast, an intervening circumstance is not present when an accused is visited by his girlfriend and a male companion after the accused's unlawful arrest but before his confession. *See Taylor v. Alabama, supra,* 457 U.S. at 691, 102 S.Ct. at 2668, 73 L.Ed.2d at 320. In light of *Taylor* and *Dunaway,* the State in its brief does not point to any intervening circumstance that merits consideration under the *Brown* attenuation analysis. The record likewise fails to disclose any meaningful intervening circumstances. The record merely indicates that Officer Montague heard a police radio broadcast concerning a robbery on Fulton Avenue *after* he had arrested Ferguson. The trial court found, however, that despite the police report the officer lacked probable cause to arrest

Ferguson.[3] The discovery of new facts about the crime after the initial arrest does not, standing alone, make the evidence obtained thereby any less the product of exploitative police misconduct. After all, it is the rule rather than the exception that police learn more about a crime after, not before, an arrest. We therefore do not consider the police radio broadcast to be a meaningful intervening circumstance.

■ The final relevant factor noted by the *Brown* Court is the purpose and flagrancy of the official misconduct. This factor effectuates the deterrence policy of the exclusionary rule by providing an incentive for police to engage in lawful conduct. Obvious examples of purposeful and flagrant conduct are dragnet operations, *see Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (police conducted a dragnet operation and fingerprinted approximately fifty young black males in connection with a rape investigation), and pretextual arrests, *United States v. Edmons*, 432 F.2d 577 (2d Cir.1970) (arrest of defendants for failure to have selective service cards in their possession was a mere pretext for investigating other crimes).

The State argues that the actions of Officer Montague in arresting Ferguson, transporting him to the police station, and then conducting a showup do not constitute a purposeful, let alone flagrant, violation of the fourth amendment. We disagree. Although to his credit the officer did not engage in a dragnet operation as in *Davis*, it remains that the officer effectuated an investigatory arrest without probable cause and transported Ferguson to the police station "in the hope that something would turn up." *Taylor v. Alabama, supra,* 457 U.S. at 693, 102 S.Ct. at 2669, 73 L.Ed.2d at 321. In this sense Ferguson's arrest was purposeful because it was aimed at investigation.

---

**3.** At oral argument the State contended that the arresting officer had probable cause to arrest Ferguson. However, that issue is not properly before us and we do not address it. *See* Md. Rule 813.

■ A weighing of the above factors as required by *Brown* compels us to conclude that the trial court erred in not suppressing the extrajudicial identification testimony as the fruit of an unlawful arrest. The temporal proximity and intervening circumstances factors provide strong support for suppression, as does the conduct of the arresting officer. In sum, we simply find no factor that weighs in favor of attenuation.

## II

Our determination that the extrajudicial identification testimony must be suppressed does not end the inquiry. The transcript reveals that the trial judge relied on both the in-court and extrajudicial identification testimony in convicting Ferguson:

> As regard to the robbery, I'll just say that I have not taken into consideration State's Exhibits 1, 2 and 3, based on my conclusion, beyond a reasonable doubt, as to the guilt of the defendant solely upon the identification which was made by the victim of the defendant, *both* at the show-up at the Western District Police Station, *as well as in the courtroom today,* which I am convinced is credible [emphasis supplied.]

In determining whether the trial court erred in admitting the in-court identification testimony, we must direct our attention to *United States v. Crews, supra,* a case that we find dispositive of this issue.

In *Crews,* a young male robbed three women in the women's restroom at the Washington Monument on two separate days. These victims described their assailant as a 15-to-18 year-old, slender, black male with a smooth complexion. Three days after the last robbery a park policeman noticed the defendant loitering near the restrooms, observed that he matched the description given by the victims, and attempted to photograph him. The officer, unable to get a suitable photograph because of inclement weather, took the defendant into custody for truancy. Police detained Crews for one hour, obtained the desired

photographs, and then released him. Two of the robbery victims identified defendant at a photographic array session and at a subsequent lineup.

The trial court suppressed both the photographic identification and the subsequent lineup identification on the basis that the detention for truancy constituted an illegal arrest. The trial court, however, permitted the victims to testify at trial, and the defendant was convicted of robbery of the first victim on the basis of that testimony.

The Court of Appeals for the District of Columbia reversed the conviction, holding that the in-court identification was the inadmissible product of the illegal detention. *Crews v. United States,* 389 A.2d 277 (D.C.App.1978) (en banc). In a unanimous decision, the Supreme Court reversed. *United States v. Crews, supra.* In writing for the Court, Justice Brennan held that the in-court identification testimony could not be excluded as the product of an illegal arrest.[4] The *Crews* Court based its conclusion on the premise that evidence challenged under the fruits of the poisonous tree doctrine is in some sense the product of illegal governmental activity. With this premise in mind, the Court identified three "distinct elements" of a victim's in-court identification of an accused:

First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. And third,

---

**4.** The only issue *Crews* raised on appeal was the admissibility of the first robbery victim's in-court identification. United States v. Crews, *supra,* 445 U.S. at 468 n. 6, 100 S.Ct. at 1248 n. 6, 63 L.Ed.2d at 544 n. 6. Indeed, the Government conceded that both the intervening photographic and lineup identifications were suppressible fruits of the illegal detention. *Id.* at 472, 100 S.Ct. at 1250, 63 L.Ed.2d at 546. *See generally Robinson v. State,* 53 Md.App. 297, 452 A.2d 1291 (1982) (noting that the in-court identification was the sole issue presented to both the Court of Appeals for the District of Columbia and the Supreme Court).

the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender.

*Id.,* 445 U.S. at 471, 100 S.Ct. at 1250, 63 L.Ed.2d at 546.   In applying these elements, Justice Brennan first observed that the victim's identity was known to police before the illegal arrest because she had notified them immediately after the robbery and had viewed file photographs the following day.   Her presence at trial was thus not traceable to any fourth amendment violation.

Moreover, the illegal arrest did not infect her ability to provide accurate identification testimony.   As the Court observed, this element is particularly important because extrajudicial identifications may influence a subsequent in-court identification, making the latter a suppressible fruit:

Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber.   No part of this process was affected by respondent's illegal arrest.   In the language of the "time-worn metaphor" of the poisonous tree, *Harrison v. United States,* 392 U.S. 219, 222 [88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051] (1968), the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.

This is not to say that the intervening photographic and lineup identifications—both of which are conceded to be suppressible fruits of the Fourth Amendment violation— could not under some circumstances affect the reliability of the in-court identification and render it inadmissible as well.   Indeed, given the vagaries of human memory and the inherent suggestibility of many identification procedures, just the opposite may be true.   But in the present case the trial court expressly found that the witness' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determina-

tion finds ample support in the record. In short, the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity.

*United States v. Crews, supra,* 445 U.S. at 472–73, 100 S.Ct. at 1250–51, 63 L.Ed.2d at 546–47 (footnotes omitted). The Court attached "particular significance" to the fact that the victim viewed her assailant at close range for approximately five to ten minutes, the accused matched the description initially given by the victim, the victim did not identify anyone else as her assailant, and only several days passed between the robbery and the initial identification. *Id.* at 473 n. 18, 100 S.Ct. at 1251 n. 18, 63 L.Ed.2d at 547 n. 18.

With respect to the third element, the *Crews* Court noted that the defendant himself was not a suppressible fruit. As a result, his illegal detention could not bar the prosecution from establishing his guilt through the introduction of evidence wholly untainted by the police misconduct. *Id.* at 474, 100 S.Ct. at 1251, 63 L.Ed.2d at 548.

■ The application of the *Crews* elements to the instant case makes clear that the in-court identification is admissible because it had an "independent source." *See Segura v. United States,* 468 U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (exclusionary rule does not apply when the prosecution learns of the evidence from an "independent source"). First, the robbery victim, Clarence Welsh, summoned police immediately after the robbery, and shortly thereafter went to the police station. As in *Crews,* these facts make clear that Welsh's presence at trial was unrelated to the illegal arrest. Second, the illegal arrest did not infect Welsh's ability to provide accurate identification testimony. Although the trial court did not expressly find that the in-court identification was not influenced by the earlier extra-judicial identification, the record indicates that Welsh had a prolonged full-face view of Ferguson, that Ferguson

matched the description given by Welsh, that Welsh did not misidentify anyone else, and that only twenty minutes elapsed between the robbery and the extrajudicial identification. Third, it is clear that Ferguson cannot challenge his presence in court on fourth amendment grounds.[5] Courts that have applied the *Crews* analysis have similarly concluded that an in-court identification of the accused by the victim of the crime is not suppressible as the fruit of any fourth amendment violation when the identification has an independent source. *See, e.g., Thorne v. State,* 274 Ark. 102, 622 S.W.2d 178 (1981), *cert. denied,* 455 U.S. 1024, 102 S.Ct. 1726, 72 L.Ed.2d 144 (1982); *People v. Teresinski,* 30 Cal.3d 822, 640 P.2d 753, 180 Cal.Rptr. 617 (1982); *People v. Suttles,* 685 P.2d 183 (Colo.1984); *People v. Payne,* 98 Ill.2d 45, 74 Ill.Dec. 542, 456 N.E.2d 44 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1310, 79 L.Ed.2d 708 (1984).

■ As noted above, the trial judge relied on both identifications and, upon our review of the record, we have no way of determining how much weight he gave to either identification. Because he relied on the extrajudicial identification, which was inadmissible, we must reverse and remand for a new trial.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND FOR A NEW TRIAL. MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY THE COSTS.

---

**5.** Although the majority opinion in *Crews* attempted to leave open the possibility that, in some circumstances, an accused himself could be a "fruit" of an illegal arrest, only two other members of the Court joined this portion of the opinion, while five Justices expressly repudiated it. *Id.* 445 U.S. at 477, 100 S.Ct. at 1253, 63 L.Ed.2d at 549 (Powell & Blackmun, JJ., concurring in part); *id.* at 477, 100 S.Ct. at 1253, 63 L.Ed.2d at 550 (White & Rehnquist, JJ., Burger, C.J., concurring in the result). Justice Marshall did not take part in the consideration or decision of *Crews.*