720 A.2d 1270

**Baron Keith BROWN**

v.

**STATE of Maryland.**

No. 407, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Dec. 4, 1998.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jack B. Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for Appellee.

Argued before EYLER, SONNER and BYRNES, JJ.

EYLER, Judge.

Appellant, Baron Keith Brown, was convicted by a jury sitting in the Circuit Court for Prince George's County of second degree murder and use of a handgun in the commission of a felony. Appellant was sentenced to 30 years imprisonment for murder and 20 years consecutive for use of a handgun in the commission of a felony. On appeal, appellant inquires (1) whether the trial court erred in denying his motion to suppress, (2) whether the trial court erred in admitting the testimony of a non-sequestered witness for the State whose name had not been included in *voir dire,* and (3) whether the trial court erred in its instructions to the jury. Finding no error, we affirm the judgments of the trial court.

## Facts

The relevant basic facts are as follows. On September 16, 1996, a police officer found the body of Ivan Hamilton, who had died as a result of a gunshot wound. Detective Bernard Nelson interviewed appellant after his arrest for the homicide. Detective Nelson testified that appellant gave him a written

statement, in which appellant said that the victim was unknown to him prior to the shooting, that the victim had approached appellant and demanded money, and that during the ensuing struggle, the victim reached for his waistband, and, fearing for his life, appellant shot him.

The victim's sister, Marlene Johnson, and the mother of the victim's child, Cassandra Bennett, testified that they had seen the victim and appellant together on one occasion each prior to the shooting.

The victim's mother, Mildred Hamilton, testified that, after appellant had been charged with the murder, Detective Nelson came to her house and brought photographs of appellant. Ms. Johnson noticed the photographs on a table in Mrs. Hamilton's house and recognized appellant in the photographs. Mrs. Hamilton mailed the photographs to Ms. Bennett, who then lived in North Carolina. Subsequently, Ms. Bennett called and stated that she recognized appellant in the photographs. Charles Berry testified that on September 16, 1996, he was in a "drug area" near where the victim's body was found. Appellant approached him and said that he was in the mood to shoot somebody and pulled a gun "halfway" out of his jacket. Shortly afterward, Mr. Berry heard gunshots.

## Discussion

### I.

Appellant moved to suppress the statement he gave to the police. The motion was denied by the trial court.

In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing, extend deference to the fact finding of the suppression judge, and accept those findings as to disputed issues of fact unless clearly erroneous. *See Jones v. State*, 343 Md. 448, 457–58, 682 A.2d 248 (1996); *Pryor v. State*, 122 Md.App. 671, 677 n. 4, 716 A.2d 338 (1998); *Partee v. State*, 121 Md.App. 237, 244, 708 A.2d 1113 (1998). We also consider those facts that are most favorable to the State as the prevailing party on the motion. *Jones*, 343 Md. at 458, 682 A.2d 248; *Partee*, 121

Md.App. at 244, 708 A.2d 1113. We make our own independent constitutional appraisal based on a review of the law as it applies to the facts of the case. *Jones*, 343 Md. at 457, 682 A.2d 248.

Detective Nelson testified that he obtained an arrest warrant for appellant on March 11, 1997. On March 20, 1997, at approximately 5:50 p.m., Officer Eldrick Creamer was on patrol in the District of Columbia with his partner, Officer Joseph Trainor, in an area known to have high drug activity. Officer Creamer testified that he saw appellant make "a motion with his hand to conceal something, went from his hand to his waist area and turned away, walked the other way." He stated that the actions led him "to believe that [appellant] might have been concealing a possible weapon, possible narcotics." He did not see appellant involved in a drug transaction. Officer Creamer approached appellant, asked him to step over to the marked police car, placed appellant's hands on the car, and conducted a protective pat-down search of appellant's outer clothing. Officer Creamer did not discover any weapons or contraband. During the pat-down, Officer Creamer obtained appellant's name, social security number, and date of birth. Immediately after the pat-down, Officer Creamer radioed his dispatcher and requested a check for outstanding warrants. Approximately five minutes after making the request, he learned that there was an outstanding warrant with respect to the homicide. He placed appellant under arrest and took him to the police station. Officer Creamer testified at the suppression hearing that, during both the pat-down of appellant's outer clothing and the check for open warrants, appellant was not free to leave. Detective Nelson arrived at the station at approximately 9:45 p.m. and, during his interview, obtained a statement regarding the homicide.

Appellant acknowledges that the initial stop was justified pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Appellant argues, however, that his subsequent detention was illegal because once the purpose of the stop had been fulfilled, *i.e.*, to determine if he had illegal

drugs or weapons, there was no justification to detain him pending a check for open warrants. Appellant concludes that the arrest flowed from the illegal detention, that his statement was a fruit of the arrest and, consequently, should have been suppressed.

Appellee argues that there was (1) a single stop for a reasonable period of time, or (2) that appellant's statement was too attenuated to be the fruit of an illegal act. We disagree with the State's first point, but agree that there is no legal connection between appellant's initial detention and his statement.

## A. Justification for Detention

■ Appellant was subjected to an extended detention, or "second stop," that was not justified by the articulated reasons for his initial detention or by any other reason. The extended portion of the detention was therefore unreasonable under the Fourth Amendment to the Constitution, which is made applicable to the states through the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ The legality of Officer Creamer's actions in stopping appellant and conducting the pat-down search for evidence of concealed weapons or contraband is not at issue. With respect to the justification and scope of an officer's actions pursuant to a *"Terry* stop," we note that the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. While the Court's opinion in *Terry* did not explore in detail the permissible length of such a stop, the Court discussed the subject in greater detail in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality).[1] Drawing on the

---

1. In *Royer*, Justice White announced the judgment of the Court and delivered the opinion of a four-Justice plurality. Justice Brennan concurred only in the result, and filed a separate opinion. On the permissible scope of seizures pursuant to *Terry*, Justice Brennan appar-

jurisprudence of searches pursuant to lawful *Terry* stops, the plurality wrote:

> "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." [*Terry*,] 392 U.S., at 19 [88 S.Ct. 1868], quoting *Warden v. Hayden*, 387 U.S. 294, 310 [87 S.Ct. 1642, 18 L.Ed.2d 782] (1967) (Fortas, J., concurring). The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justification.
>
> ... The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.

*Royer*, 460 U.S. at 500, 103 S.Ct. 1319.

In ascertaining the permissible length of investigative stops under *Terry*, we have reasoned that once the purpose of an initial stop has been satisfied, the stop is ended; a continued detention beyond that point comprises a "second stop" that requires additional justification. *See Pryor*, 122 Md.App. at 682, 716 A.2d 338; *Munafo v. State*, 105 Md.App. 662, 669–70, 660 A.2d 1068 (1995); *Snow v. State*, 84 Md.App. 243, 267, 578 A.2d 816 (1990). Of course, during a valid *Terry* stop, law enforcement officers may take contemporaneous investigative steps that would not independently justify the detention of the suspect, so long as those steps do not add additional time to the stop, *i.e.*, are completed within the period of time defined

---

ently was even more protective than the plurality. *See Royer*, 460 U.S. at 511 n. *, 103 S.Ct. 1319 (Brennan, J., concurring) ("As I have discussed, a lawful stop must be so strictly limited that it is difficult to conceive of a less intrusive means that would be effective to accomplish the purpose of the stop."). Apparently, a majority of the *Royer* Court therefore agreed that the scope of a *Terry* stop could be no less protective of individual rights than the standards expressed in the plurality opinion.

by the legitimate purposes for the stop. *See In re Montrail M.*, 87 Md.App. 420, 436–37, 589 A.2d 1318 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992). But whether courts perceive distinct "stops" or simply test the entire period of detention for underlying constitutional justification, it is clear that the full extent of any seizure under *Terry* must be justified by "a reasonable, articulable suspicion that a crime is being or is about to be committed." [2] *Snow,* 84 Md.App. at 265, 578 A.2d 816. *See also Royer,* 460 U.S. at 498, 103 S.Ct. 1319; *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868; *Munafo,* 105 Md.App. at 673, 660 A.2d 1068.

*Snow* and *Munafo* both involved valid stops for suspected traffic violations. The drivers were detained slightly longer than the period justified by the articulated purposes for the stops, based on each officer's "hunch" that other illegal activity might be going on, and this Court in each case concluded that the evidence discovered during the extended period of detention should have been suppressed. *See Munafo,* 105 Md.App. at 673, 676, 660 A.2d 1068; *Snow,* 84 Md.App. at 247–48, 267, 578 A.2d 816. Similarly, in *Pryor,* 122 Md.App. at 680–81, 716 A.2d 338, a driver was detained both for suspected drug possession and for speeding. The driver was detained for 20 to 25 minutes so that a drug sniffing dog could be brought to the scene. *Id.* at 677, 716 A.2d 338. We noted that a detention for 20 to 25 minutes could not be justified by the normal procedure for issuing a traffic citation and a concurrent "plain view" inspection for drugs from the vehicle's exterior. *Id.* at 682, 716 A.2d 338. As a consequence, we concluded that the drugs located by the drug dog and seized by police during the extended detention of the driver should have been suppressed. *Id.*

---

**2.** The suspicion of criminal activity required for a valid *Terry* stop is generally not required for a "checkpoint" stop. *See, e.g., United States v. Martinez–Fuerte,* 428 U.S. 543, 561–62, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) *Gadson v. State,* 341 Md. 1, 10–11, 668 A.2d 22 (1995). The State does not contend that appellant was subjected to a checkpoint stop.

The reasoning of the Court of Appeals in *Gadson v. State,* 341 Md. 1, 668 A.2d 22 (1995), is also pertinent here. In that case, the defendant, a visitor to the House of Correction in Jessup, entered State grounds in a vehicle and was stopped at a guard booth about a quarter of a mile away from the prison. 341 Md. at 6, 668 A.2d 22. The initial stop was routine, and justified under the "checkpoint" exception to *Terry. See id.* at 10–11, 668 A.2d 22. The purpose of the guard booth was to prevent illegal drugs from being smuggled into the prison. *Id.* at 7, 686 A.2d 22. The defendant was told that a drug sniffing dog would be used to test for the presence of drugs in his vehicle. *Id.* He objected to the procedure, and asked for permission to leave the grounds, which was denied. *Id.* The dog alerted its handler to the presence of drugs in the vehicle, the suspect was arrested, and his subsequent motion to suppress the evidence seized was denied. *Id.*

The Court of Appeals determined that the prolonged seizure that had occurred when the suspect was denied permission to leave the area did not serve the articulated interest in keeping drugs out of the prison. *Id.* at 11, 686 A.2d 22. The Court said the State's goal was actually accomplished by the suspect's request to turn around. *Id.* at 12, 686 A.2d 22. The Court therefore concluded that "a limited seizure of the kind at issue here may not be extended beyond the point where its purpose has been accomplished unless there is reasonable, articulable suspicion of criminal activity to justify further detention." *Id.* at 13–14, 686 A.2d 22. Thus, although the initial justification for the stop was different from the initial justification in the "second stop" cases, *supra,* the further detention of the defendant was measured by the same standard. The Court concluded that the State's interest in the prolonged seizure was actually a broader interest in "the detection and seizure of illegal narcotics generally," which the Court rejected as beyond the scope of the articulated purpose of the guard booth. *Id.* at 12, 686 A.2d 22.

In the case at bar, Officer Creamer stopped appellant on suspicion of "concealing a possible weapon, possible narcotics." This suspicion apparently was satisfied by the brief pat-down of appellant's outer garments because no further search was

conducted. Appellant complied with the search; his actions did not raise suspicion of other crimes. The continued detention of appellant for five minutes was therefore unreasonable. Officer Creamer did not articulate a suspicion of criminal activity other than as noted above. A suspicion that appellant was involved in general criminal activity on the night in question would be far too broad in any event and could not be confirmed or alleviated by a check for open warrants.

The State argues that "the warrant check here was conducted contemporaneously to the pat-down search." Officer Creamer testified at the suppression hearing that he conducted the pat-down search of appellant *and* subsequently contacted his dispatcher to request the warrant check. The two events were therefore consecutive.

This Court has noted in the past that a brief check for open warrants on a suspect is a recognized investigatory technique in the course of a *Terry* stop. Recently, in *Flores v. State,* 120 Md.App. 171, 706 A.2d 628 (1998), we considered a challenge to the denial of a motion to suppress a photograph of the defendant taken during a lawful *Terry* stop. We noted that the police in that case had probable cause to arrest the defendant based on a sale of drugs to an undercover detective, but to facilitate an ongoing undercover operation, decided merely to stop the suspect and take a picture of him. *Flores,* 120 Md.App. at 179–80, 706 A.2d 628. The defendant was later arrested in a mass police raid and charged with conducting the previous drug transaction. *Id.* at 180, 706 A.2d 628.

We concluded that, although the purpose of the brief detention of the defendant was not purely investigatory, the Supreme Court in *Terry* had recognized the need for the development of flexibility in the detection and prevention of crime. We quoted Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 9.2(f) at 51–58 (1996) (footnotes omitted), for a list of the many accepted investigatory techniques available to police conducting a *Terry* stop. Among these, LaFave listed communication with others "to confirm

the identification or determine whether a person of that identity is otherwise wanted."

We reaffirm the principle that law enforcement officers must not be deterred from employing flexible investigative techniques. The technique of holding a defendant pending a brief check for open warrants may be appropriate in some situations and inappropriate in others, depending upon the articulated purposes for the initial stop and the developments during the stop itself. As LaFave also notes in *Search and Seizure, supra,* quoting *State v. Watson,* 165 Conn. 577, 345 A.2d 532, 537 (Conn.1973):

> The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

Thus, if the suspect's explanation needs to be checked out, and in particular if his explanation is known to be false in some respects, there is reason to continue the detention somewhat longer while the investigation continues. On the other hand, if a person is stopped on suspicion that he has just engaged in criminal activity, but the suspect identifies himself satisfactorily and investigation establishes that no offense has occurred, there is no basis for further detention, and the suspect must be released. This latter point has sometimes but not always been interpreted to mean that if a person is lawfully stopped for some minor (most likely traffic) violation which does not result in arrest, the detention may not be extended to facilitate a warrant check for possible outstanding charges absent reasonable suspicion that such charges exist.

*Search and Seizure,* § 9.2(f) at 60–65.

Other jurisdictions faced with a prolonged detention to check for outstanding warrants beyond that which can be supported by the articulated purposes for the stop, or devel-

oped during the stop itself, have adjudged the detention unreasonable under the Constitution. *See United States v. Luckett,* 484 F.2d 89, 90–91 (9th Cir.1973) (per curiam) (concluding that action of police in stopping jaywalker, issuing a citation, and thereafter holding jaywalker for a warrant check, without reason to suspect that there may be an outstanding warrant, was unreasonable); *People v. McGaughran,* 25 Cal.3d 577, 159 Cal.Rptr. 191, 601 P.2d 207, 212–13 (Cal.1979) (in bank) (second period of detention to run check for open warrants "exceeded constitutional limitations," where extended detention was not reasonably necessary to the purpose for the stop, and lasted approximately ten minutes beyond the time needed to discharge the articulated purpose for initial stop); *People v. Cobb,* 690 P.2d 848, 853 (Colo.1984) (en banc) (remanding for determination as to "whether the defendants were detained only for that amount of time necessary to obtain identification and an explanation of their behavior—the purpose of the stop—or whether they were actually detained for an excessive additional time to await the results of the warrant check"); *Wilson v. State,* 874 P.2d 215, 222–26 (Wyo. 1994) (seizure of a pedestrian for the purpose of conducting an open warrants check is not permitted where the seizure is not supported by reasonable suspicion of criminal activity). *Cf. United States v. Finke,* 85 F.3d 1275, 1280 (7th Cir.1996) (concluding that although court is "reluctant" to hold that noncontemporaneous criminal background checks during routine traffic stops are always reasonable, additional developments during stop in this case supported prolonged detention for warrants check); *People v. H.J.,* 931 P.2d 1177, 1182 (Colo.1997) (en banc) (insufficient proof of registration of vehicle provided reasonable suspicion that vehicle might be stolen, and authorized investigatory detention of occupants for suspected involvement in car theft; occupants were therefore reasonably detained pending check for outstanding arrest warrants); *State v. Bell,* 382 So.2d 119, 119–20 (Fla.App.1980) (conduct of defendant in peering into first floor window of an apartment in a high crime area at 4:30 a.m., and in attempting

to flee from police, justified the detention of defendant and a check for outstanding warrants).

Some courts, however, have stated that a check for outstanding warrants is permissible as part of a lawful *Terry* stop although most, but not all, of the decisions can be explained by the fact that the check was done before the purpose of the stop had been fulfilled. *See United States v. McRae*, 81 F.3d 1528, 1535 n. 6 (10th Cir.1996) (criminal record check authorized as part of a routine traffic stop); *Biggers v. State*, 162 Ga.App. 163, 290 S.E.2d 159, 160 (Ga.App.1982) (information that two men sitting in a parked car may have been armed, coupled with officer's discovery that license tag had expired, created "reason to suspect that appellant . . . may have been present for illicit purposes," thus justifying detention for reasonable time to check for open warrants); *People v. Ellis*, 113 Ill.App.3d 314, 68 Ill.Dec. 885, 446 N.E.2d 1282, 1286 (Ill.App.1983) (after a valid *Terry* stop, a check for outstanding arrest warrants is justified, so long as there is no evidence that check took "an unusually long time or was otherwise overly intrusive"); *State v. Pleas*, 329 N.W.2d 329, 333–34 (Minn.1983) (extended length of detention of occupants of automobile, to in part, conduct a warrant check, was reasonable given facts that rear license plate was upside down, front plate was missing, and car had been seen leaving store which had frequently been the victim of "petty thievery"); *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304, 307 (Neb.1986) (check for outstanding warrants part of normal procedure for traffic offense stop); *State v. McFarland*, 4 Ohio App.3d 158, 446 N.E.2d 1168, 1171–72 (Ohio App.1982) (detention and check for outstanding warrants was reasonable in light of actions of defendant in high crime area in apparently placing something inside crotch of trousers and walking away, and officer's suspicion that unusual first name of defendant was associated with prior drug investigation); *State v. DeMasi*, 448 A.2d 1210, 1213 (R.I.1982) (additional five minutes of detention of occupants of vehicle for the purpose of running outstanding warrants check on all of them was justified in light of driver's suspected attempts to evade police cruiser by turning fre-

quently, passenger's actions in turning around several times to view police vehicle, and vehicle's heavily laden appearance); *State v. Chapman,* 921 P.2d 446, 452–53 (Utah 1996) (defendant properly detained for loitering can be held pending check for outstanding warrants so long as length of check does not significantly extend the period of detention); *State v. Madrigal,* 65 Wash.App. 279, 827 P.2d 1105, 1107 (Wash.App.1992) ("Outstanding warrant checks during valid criminal investigatory stops are reasonable routine police procedures.").

■ Aside from cases involving the long-recognized checkpoint exception to *Terry,* we find little support for a detention on less than reasonable, articulable suspicion or for longer than necessary to fulfill the purpose of the stop, in analogous prior cases of the Supreme Court or of this State. A seizure that extends beyond the purposes for the stop, regardless of the length of time, must at a minimum be justified under the *Terry* line of cases.

### B. *"Fruit of the Poisonous Tree" Doctrine*

■ Appellant argues that the inculpatory statement he gave to Officer Nelson approximately four hours after he was detained flowed directly from his arrest on the open murder warrant; that the initial detention of appellant while Officer Creamer checked for open warrants was illegal; and that the inculpatory statement should have been suppressed. We conclude that appellant's motion to suppress his statement was properly denied because the statement was not a product of his illegal detention.

■ Under the "fruit of the poisonous tree" doctrine, evidence acquired by the police through an illegal arrest will be excluded from a subsequent criminal prosecution. *See Wong Sun v. United States,* 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The prosecution can avoid this result by showing that the connection between the illegal conduct of the police and the subsequent discovery of evidence "has 'become so attenuated as to dissipate the taint.'" *Id.* at 487, 83 S.Ct. 407 (quoting *Nardone v. United States,* 308 U.S. 338,

341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)). In *Wong Sun*, the Supreme Court resisted the application of a "but for" test to define the fruits of illegal police conduct, stating instead that

> the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Id.* at 487–88, 83 S.Ct. 407 (quoting Maguire, *Evidence of Guilt*, 221 (1959)).

When faced with resolving questions of the exclusion of evidence obtained as a result of an illegal seizure of a suspect, courts of this State generally have employed the balancing approach outlined by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Brown*, the Court considered whether incriminating statements given by a defendant after he was arrested illegally were sufficiently the product of the illegal arrest to warrant their exclusion, or were admissible despite the illegal arrest because of the prior reading of *Miranda* [3] warnings. *Brown*, 422 U.S. at 591–92, 95 S.Ct. 2254. The Court held that *Miranda* warnings alone could not break the causal chain between the illegal arrest and the incriminating statements. *Id.* at 603, 95 S.Ct. 2254. Instead, the Court stated that *Miranda* warnings are an "important factor" in determining whether a confession is obtained by exploitation of an illegal arrest. *Id.* The Court discussed three additional factors relevant to such a determination: "The temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct. . . ." *Id.* at 603–04, 95 S.Ct. 2254. This analysis was adopted by the Court of Appeals in *Ferguson v. State*, 301 Md. 542, 549, 483 A.2d 1255 (1984), and applied by this Court before and after *Ferguson.* *See, e.g., McMillian v. State*, 85 Md.App. 367, 382–83, 584 A.2d 88 (1991), *vacated on other grounds*, 325 Md. 272,

---

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

600 A.2d 430 (1992); *Ryon v. State*, 29 Md.App. 62, 68–72, 349 A.2d 393 (1975), *aff'd*, 278 Md. 302, 363 A.2d 243 (1976) (per curiam).

No Maryland decision since *Brown* has addressed the potential exclusionary effect of an illegal detention followed by the discovery of a pre-existing warrant and an arrest on the open warrant. Courts in other jurisdictions have applied the *Brown* attenuation analysis in such situations, weighing the subsequent arrest or detention as a potential attenuating event along with other relevant factors. *See United States v. Green*, 111 F.3d 515, 521 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 427, 139 L.Ed.2d 328; *People v. Jones*, 828 P.2d 797, 800 (Colo.1992); *Neese v. State*, 930 S.W.2d 792, 801–03 (Tex.App.1996). Under this approach, on the facts of the present case, the valid arrest pursuant to an open warrant would become just another attenuating factor, albeit an important one, in determining whether the challenged evidence was come at by exploitation of the initial illegal detention of appellant.

We reject this approach. We conclude instead that the *Brown* factors are immaterial to the present case because the statement at issue was the product of appellant's valid arrest for murder, which was supported by probable cause existing before the illegal detention of appellant. Appellant's statement could not have been the product of his five minutes of unlawful detention.

In *New York v. Harris*, 495 U.S. 14, 16–17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the Supreme Court considered whether an inculpatory statement given by a murder suspect was the product of the suspect's illegal arrest in his home without an arrest warrant. The Court accepted the lower court's finding that the defendant did not consent to the initial intrusion, and that the police had probable cause to arrest the defendant for murder. *Id.* at 17, 110 S.Ct. 1640. While in his home, the defendant was informed of his *Miranda* rights, and admitted to the murder. *Id.* at 16, 110 S.Ct. 1640. The defendant was then taken to the station house, where he was again informed

of his *Miranda* rights before signing a written inculpatory statement. *Id.* The defendant's first statement to the police was suppressed, and the only issue on appeal was whether the second statement should have been suppressed as a fruit of the illegal arrest. *Id.*

On these facts, the Court first stated that the police had violated the holding of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that the Fourth Amendment prohibits a warrantless, nonconsensual entry of a suspect's home for the purpose of making a routine felony arrest. *Id.* at 16–17, 110 S.Ct. 1640. The Court explained, however, that despite the illegality of the arrest, the defendant could not successfully argue that he was immune from prosecution because his person was the fruit of the arrest. Because the officers had probable cause to arrest the defendant, he was not in unlawful custody when he was taken to the station house. *Id.* at 18, 110 S.Ct. 1640. Noting the attenuation approach of the *Brown* line of cases, the Court reasoned that "that attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal government activity.'" *Id.* at 19, 110 S.Ct. 1640 (quoting *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)). The Court concluded that because the defendant was in lawful custody when he made the statement, and the police had a justification to question him before the arrest, the defendant's statement was not the product of the illegal entry into his home.[4] *Id.*

This Court followed *Harris* in *Torres v. State,* 95 Md.App. 126, 619 A.2d 566 (1993). *Torres* also involved an alleged *Payton* violation, an arrest and reading of *Miranda* warnings,

---

4. Four Justices dissented from the opinion. Justice Marshall, writing for the dissent, stated that "[i]n the majority's view, when police officers make a warrantless home arrest in violation of *Payton,* their physical exit from the suspect's home *necessarily* breaks the causal chain between the illegality and any subsequent statement by the suspect, such that the statement is admissible regardless of the *Brown* factors." *Harris,* 495 U.S. at 26, 110 S.Ct. 1640 (Marshall, J., dissenting).

and subsequent confession at the police barracks. *See Torres,* 95 Md.App. at 129, 619 A.2d 566. Judge Moylan, writing for the Court, concluded that because probable cause to question the defendant existed before the challenged arrest, there was "a clean break in the chain of cause and effect;" the challenged arrest had ripened into a valid arrest once the suspect was removed from the protected premises. *Id.* at 131, 619 A.2d 566.

In ruling on appellant's motion to suppress his confession in the present case, the suppression court stated as follows:

Even if I were to find that there was not probable cause to detain him, I do find, one, that there was a valid warrant here, and I also find that Officer Creamer acted in good faith on the information that he had at the time on the street, and that Officer Nelson further acted in good faith when he came there, and at that time there was a properly executed and issued warrant to arrest [appellant].

So, based on what I have, even if I found that there was not a proper detention, the fact that he was detained and Officer Nelson came and arrested him at that time I think everything that flows from that point is admissible and, therefore, the motion to suppress the statement is denied.

We agree with this reasoning. Officer Creamer arrested appellant on probable cause that he had committed murder— probable cause supported by knowledge of the existence of the outstanding arrest warrant. Appellant was therefore properly under arrest when questioned by Officer Nelson, and his statement while in lawful custody could not have been the product of the intervening five minutes of unlawful detention by Officer Creamer. The only connection to the stop was that appellant's name was obtained during the pat-down and prior to the illegal detention. There is no assertion that appellant's statement was not otherwise voluntary. Appellant was advised of his *Miranda* rights and wrote part of the statement at issue in his own handwriting.

The case at bar is analogous to *Harris* and *Torres.* While no *Payton* violation is at issue here, appellant's detention after

he was frisked and before the discovery of the open warrant for his arrest was illegal. As in *Harris,* anything said in the course of appellant's illegal detention would have been subject to suppression. Nevertheless, the illegal detention of appellant for five minutes had no legal impact on the development of probable cause for his arrest, the issuance of an arrest warrant, or the subsequent questioning of appellant based on that warrant and pre-existing probable cause. Finding no exploitation of illegal police activity in this case, we need not engage in the attenuation analysis of *Brown v. Illinois.*

## II.

Prior to trial, the parties invoked the sequestration rule. Appellant contends that the trial court erred in admitting the testimony of Mildred Hamilton, the victim's mother, because she had not been sequestered and had not been included on the witness list for purposes of *voir dire.* Appellant presents no argument with respect to the latter point, and we do not address it.

With respect to his first point, appellant states that, pursuant to Art. 27, § 773 of the Annotated Code of Maryland and Rule 5–615, the witness, as a relative of the victim, could be in the courtroom only after she had testified. Because she was in the courtroom prior to taking the witness stand, the sequestration rule was violated. Appellant asserts that the prosecutor's violation was deliberate and prejudicial. Acknowledging that the trial court had discretion to permit the witness to testify despite a violation of the sequestration order, appellant states that the court based its ruling on an erroneous understanding of the law. Appellant concludes that the trial court did not exercise its discretion or investigate the matter despite the requirement that it do so or, alternatively, that permitting the witness to testify was an abuse of discretion. We disagree and explain.

Mildred Hamilton, the victim's mother, was called to testify after hearing the testimony of Marlene Johnson, the victim's sister, and Cassandra Bennett, the victim's former girlfriend.

Johnson and Bennett had testified that they had identified appellant from photographs as an acquaintance of the victim. Appellant had given a statement claiming that he did not know the victim prior to the shooting. On cross-examination of both Johnson and Bennett, defense counsel inquired as to whether Mildred Hamilton had suggested in any way that they identify appellant. Both witnesses denied that their identifications of appellant were influenced by Mrs. Hamilton.

The State then called Mildred Hamilton to testify that she had not suggested to the other two witnesses that they should identify appellant. Before she took the stand, the following colloquy ensued, which we present as transcribed:

THE COURT: Approach the bench.

[At the bench:]

THE COURT: She's not on the witness list.

[PROSECUTOR]: I didn't think I would be calling her now.

[DEFENSE COUNSEL]: Been in the courtroom too.

THE COURT: Been in the courtroom.

[PROSECUTOR]: She's been in the courtroom, next of kin to the victim, 544(b).

[DEFENSE COUNSEL]: I know what the section says. In this particular instance the court has to make a decision here. Pretty obvious what's going on.

THE COURT: Been in the courtroom, She's the next of kin.

[PROSECUTOR]: You are the one who brought it up.

[DEFENSE COUNSEL]: I am the one that had to bring that up.

THE COURT: I understand. Probably the first question anyway, but notwithstanding that, I think it is appropriate in light of the way the testimony is going on, I will allow her testimony.

. . . .

[DEFENSE COUNSEL]: I would object to this witness being called. She was never listed as a witness by the State

to be called in this case during voir dire. We have no idea whether this jury knows or doesn't know her, and probably more alarming is the fact that she has sat here throughout the testimony of last two witnesses and is keenly aware of how important it will be to clarify or at least clear up some of problems the first two witnesses and the last two witnesses just had.

I am somewhat at a disadvantage because I mean I have to now having heard that the purpose of the rule on witnesses, I guess, to prevent witnesses from hearing what takes place, so they can tailor their testimony, not in any way suggesting Mrs. Hamilton, but I think just by the way the evidence has gone down so far it should cause the Court some concern, if she is sending photographs to people under the situations that we have, having the identification made the way it was done, and discussing the importance of putting them together, I think it is a dangerous combination. I am objecting to any testimony from her at all for those reasons.

THE COURT: Did you want to talk to her before?

[DEFENSE COUNSEL]: Not a question of talking to her.

THE COURT: Do you want to talk to her?

[DEFENSE COUNSEL]: No that doesn't clear the problem.

THE COURT: Objection overruled. You may proceed.

Rule 5–615, entitled, "Exclusion of witnesses," provides in part:

(a) *In general.* Except as provided in sections (b) and (c) of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses. When necessary for proper protection of the defendant in a criminal action, an identification witness may be excluded before the defendant appears in open court. The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time. The court may continue

the exclusion of a witness following the testimony of that witness if a party represents that the witness is likely to be recalled to give further testimony.

(b) *Witnesses not to be excluded.* A court shall not exclude pursuant to this Rule

. . .

(5) a victim of a crime of violence or the representative of such a deceased or disabled victim to the extent required by statute.

At the time of trial, Article 27, § 773(b) and (c) of the Annotated Code provided:

(b) *Presumption in favor of victim.*—A victim or representative shall be presumed to have the right to be present at the trial.

(c) Sequestration of victim.—The judge may sequester a victim or representative from any part of the trial at the request of the defendant or the State only after a finding of good cause.[5]

Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 773(b), (c). The term "representative," is defined in the Code as follows:

(3) "Representative" means a person who is:

(i) 1. Subpoenaed or has testified; and

2. Selected by the next of kin or guardian of a person who is deceased or disabled as a result of a crime of violence under § 643B of this article or a crime involving, causing, or resulting in death or serious bodily harm; or

(ii) Designated by the court in the event of a dispute over the representative.

Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 773(a). The prosecutor was apparently referring to the above provisions regarding attendance by "representatives" when he claimed Mrs. Hamilton was entitled to attend as "next of kin to the victim."

---

5. Article 27, § 773 of the Annotated Code was amended by 1998 Md. Laws, Ch. 479 (effective Oct. 1, 1998).

In *Redditt v. State,* 337 Md. 621, 629, 655 A.2d 390 (1995), the Court of Appeals stated that when a violation of a sequestration order is established, "whether there is to be a sanction and, if so, what sanction to impose, are decisions left to the sound discretion of the trial judge." *See also Brown v. State,* 272 Md. 450, 477–78, 325 A.2d 557 (1974). It follows that the violation of a sequestration order does not compel a *per se* exclusion of the witness's testimony. *See Redditt,* 337 Md. at 629, 655 A.2d 390; *Brown,* 272 Md. at 478, 325 A.2d 557 ("The complete exclusion of the testimony of witnesses for a violation of the sequestration rule is not lightly to be imposed as a penalty even upon an offending party."). In *Redditt,* the Court discussed several factors that have been considered in prior cases, including the good faith of the witness who violated the sequestration order and of the party calling the witness, the influence that the witnesses' observations in court might have had on the witnesses' testimony, and the potential prejudice resulting from the violation. *See id.* at 629–38, 655 A.2d 390.

On the facts of the present case, the trial court was well within its discretion in refusing to exclude the testimony of Mrs. Hamilton. The court apparently believed the prosecutor's assertion that he had no intention of calling Mrs. Hamilton before defense counsel's cross-examination of Johnson and Bennett. The trial court was also in the best position to judge the veracity of the prosecutor's professed belief that Mrs. Hamilton was entitled to attend the trial under Article 27, § 773. While such a mistake of law does not bear on the issue of whether a violation occurred, the court was entitled to view it as a good faith belief, tending to mitigate the sanction, if any, that should be imposed. *Cf. Frazier v. Waterman Steamship Corp.,* 206 Md. 434, 443–45, 112 A.2d 221 (1955) (concluding that defense counsel's "inattention or inadvertence" in conveying the substance of prior testimony to sequestered defense witnesses before they testified did not mandate exclusion of their testimony under the circumstances). There is no suggestion that Mrs. Hamilton deliberately violated the sequestration order.

Moreover, Johnson and Bennett testified independently that Mildred Hamilton had not suggested to them that they should identify appellant. Mrs. Hamilton merely corroborated that testimony. Defense counsel refused the opportunity to conduct a *voir dire* of Mrs. Hamilton after she was called, and did not ask her questions about her previous presence in the courtroom on cross-examination. There is no showing that Mildred Hamilton's testimony was tainted by her observations in the courtroom, and thus, no indication of undue prejudice.

The trial court addressed the sequestration issue, quickly determined the extent of the violation, and exercised its discretion to impose no sanction. The trial court did not abuse its discretion.

## III.

■ Appellant contends that the trial court erred in instructing the jury that, if it found that appellant had intimidated Charles Berry, it could consider such intimidation as evidence of guilt. Appellant argues that the testimony of Charles Berry as to his contact with appellant was too equivocal to be considered a threat or intimidation.

■ Upon request by any party, a court shall "instruct the jury as to the applicable law and the extent to which the instructions are binding." Rule 4–325(c). Instructions must relate both to the evidence and to the charged offenses to be considered by the jury. *See State v. Daughton*, 321 Md. 206, 212, 582 A.2d 521 (1990) (citing *State v. Hutchinson*, 287 Md. 198, 206, 411 A.2d 1035 (1980)). An instruction not supported by the evidence adduced at trial is an abstraction and should not be given. *Rustin v. Smith*, 104 Md.App. 676, 680, 657 A.2d 412 (1995). *See also Baltimore Transit Co. v. Pue*, 243 Md. 256, 262, 220 A.2d 551 (1966); *Moats v. Ashburn*, 60 Md.App. 487, 493, 483 A.2d 791 (1984).

Here, Charles Berry stated that on September 16, appellant told him that he was in the mood to shoot somebody and showed him a gun. Thereafter, Berry heard shots fired. Berry, a police informant, testified that appellant was trying

to intimidate him. When asked if appellant said anything to him in the days after the incident, Berry responded, "The first time he asked me, he told me that he heard I was telling them—I told him believe what he wanted to believe." The trial court instructed the jury as follows: "You must first decide whether the defendant intimidated Charles Berry.... If you find that the defendant intimidated Charles Berry in this case, then you must decide whether that conduct itself shows a consciousness of guilt."

Berry's testimony that appellant intimidated him with a gun before the shooting, and that appellant told Berry after the shooting that he had heard Berry was "telling them," supported the court's instruction.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**