843 A.2d 216

**David Nolan CONBOY**

v.

**STATE of Maryland.**

**No. 2298, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

March 2, 2004.

354

356

Adina N. Amith (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Edward J. Kelley (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: SALMON, KRAUSER and BARBERA, JJ.

KRAUSER, Judge.

While under the influence of alcohol, appellant, David Conboy, crashed a Ford van into a ditch by the side of a state road. The van contained construction equipment and was littered with alcoholic beverages. Leaving the badly damaged vehicle where it lay, appellant fled the scene of the accident only to return later, in a taxicab, to retrieve his belongings and the equipment. His return, however, was met by more than a wrecked vehicle. A state trooper had arrived and was investigating the accident.

As the trooper approached the cab, he asked appellant whether he was "Mr. Conboy," the man who the trooper had reason to believe was driving the van at the time of the accident. Inebriated and reeking of alcohol,[1] appellant responded, "I'm not David Conboy," thereby revealing what sober reflection might have helped him conceal—his true identity. Unaware of how inculpatory this denial was, appellant then insisted that his name was "George Mitchell Unson"—a less inventive choice than one might think as it apparently belonged to appellant's step brother, whose reaction to this choice has gone unrecorded.

---

1. It was undisputed at the motion to suppress that at the time of the search at issue, appellant, in the words of the trooper, "appeared intoxicated" and that the trooper "detected a strong odor of an alcoholic beverage coming from his breath and person."

Observing a rifle in the backseat of the cab, which would later turn out to be loaded, the trooper asked appellant to step out of the cab. When he did, the trooper patted him down for weapons. Upon feeling a key in appellant's back pocket, the trooper reached into that pocket and retrieved what would ultimately prove to be the key to the van. That, in turn, led appellant to volunteer that he was drunk and had in fact been the driver of the van.

Appellant was subsequently charged with driving while under the influence of alcohol and numerous other traffic violations.[2] Seeking to exclude evidence of the key and his statement, he filed a motion to suppress in the Circuit Court for Worcester County, claiming that when the trooper reached into his pocket to retrieve the key the trooper exceeded the bounds of a permissible *Terry*[3] stop and that his ensuing inculpatory statement was obtained in violation of the Fifth Amendment. When that motion was denied, appellant was tried upon an agreed statement of facts and convicted of driving while under the influence of alcohol.

---

**2.** Appellant was charged with violating the following 13 sections of the Transportation Article:

Section 21–902(a)(1): Driving under the influence of alcohol.
Section 21–902(a)(2): Driving under the influence of alcohol per se.
Section 21–902(b): Driving while impaired by alcohol.
Section 20–103(b): Failure to return to and remain at the scene of an accident involving attended vehicle.
Section 20–104 (d): Failure of driver in property damage accident to report to nearest police.
Section 16–303(c): Driving on suspended license.
Section 16–303(d): Driving on a revoked license.
Section: 16–112(c): Failure to display license on demand.
Section 16–112(e): Vehicle driver giving a false and fictitious name to uniformed police.
Section 13–411(g): Displaying registration plate issued to another.
Section 13–409(b): Failure to display registration card on demand.
Section 14–107(f): Knowingly possessing vehicle with remove identification, as the van's VIN had been removed.
Section 13–401(b): Operating an unregistered motor vehicle.

But the State entered a nolle prosequi as to all of the offenses but one, 21–902(a) D.U.I., the charge upon which appellant was tried and convicted.

**3.** *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

He now asks this court to review the refusal of the trial court to suppress these two pieces of evidence. We do so and reach the same result as the trial court did but not necessarily for the same reason.

## SUPPRESSION MOTION

The only evidence presented at the suppression hearing was the testimony of State witness, Trooper David Grinnan of the Maryland State Police. He testified that, on May 28, 2002, at approximately 6:02 pm, he responded to a report of "a single vehicle accident at Route 50 and Silver Point Lane in West Ocean City, Worcester County, Maryland." There, he found an unoccupied "older model Ford van facing eastbound in the westbound ditch, approximately thirty to forty yards past Silver Point Lane." Badly damaged, the van was almost resting on its side; its driver's side wheels "ripped from the vehicle."

The trooper observed "alcohol containers in the vehicle" and further noted that "alcohol had spilled" inside the vehicle, "leaving a strong odor." In addition to the alcoholic beverages, the van contained a stereo and construction tools and equipment.

The trooper then "ran the registration to find out who the vehicle belonged to, who the operator could be." He learned that the vehicle's license plates belonged, not to a Ford van as expected, but "to an '85 Chevrolet van ... registered to a subject named Wolf," who resided in West Ocean City, Maryland. Unable to further identify the owner of the Ford van, the trooper left the accident scene to interview Wolf at the address he had been given. At that address, he found Wolf, who explained that he had removed the license plates from his Chevrolet van and given them to his brother for "safekeeping." He also informed the trooper that a "David Conboy," who was then staying with his brother, had taken the license plates and placed them on the Ford van in question.

Leaving Wolf's residence, Trooper Grinnan returned to the accident scene, arriving 30 to 40 minutes after he had initially

responded to the accident. When he arrived, he observed that the stereo, the construction tools and equipment, and other items had been removed from the van. He concluded that "whoever had wrecked the van ... was still in the area," reasoning that removal of all of the equipment would have taken several trips. At the suppression hearing, he opined: "[I]f I was a construction person and I wrecked my van and I had twenty thousand dollars' worth of equipment in there, I am going to keep going back to the van until my equipment is gone because I am not going to leave the van unattended like that."

A taxicab then "roll[ed] up" to a nearby stop sign. "Thinking that if this person is wrecked he needs to get out of here somehow," the trooper's attention shifted to the cab. He saw appellant "in the front passenger's seat." Although the taxi cab driver was looking in the trooper's direction, appellant "would not look at [him] to save his life." Indeed, "his head was plastered in the opposite direction from mine," the trooper noted. Appellant's "continued" refusal to "acknowledge" the trooper, the crash, or the trooper's marked and well-lit cruiser, only "sparked [the trooper's] curiosity." After all, according to the trooper, "when you have that situation, everybody wants to look." Trooper Grinnan then "pointed the cab over to investigate."

Approaching appellant, who was still seated in the passenger's side of the vehicle, the trooper asked, "Mr. Conboy?" Appellant responded, "I'm not David Conboy" and then identified himself as "George Mitchell Unson," using his stepbrother's name. According to the trooper, appellant "appeared intoxicated," and he detected a "strong odor of an alcoholic beverage coming from [appellant's] breath and person." A deer rifle and a bottle of Popov vodka lay on the backseat of the cab.

After appellant explained that the rifle was his and that he liked to hunt, the trooper asked appellant to step out of the cab. When he did, the trooper "patted him down ... to make sure that [appellant] did not have any other kind of weapons

that may be associated with deer hunting, such as buck knives."

During the pat down, the trooper felt an object in appellant's back pocket. He "immediately recognized" that it was "a key of some type," possibly a car key. "[B]ased on the fact that the collision had occurred" and that a vehicle lay "unattended in the ditch," the trooper placed his hand in appellant's pocket and retrieved the key. The key turned out to be "a Ford key, belonging to a Ford motor vehicle." After directing appellant to sit on the ground, the trooper returned to the van with the key. He then "checked the Ford key with the van and turned the ignition over and discovered that the key was, in fact, the key to the [wrecked] van."

As he returned to where appellant was sitting, Trooper Grinnan remarked, "it's funny, the key fits." Appellant "shrugged" and "threw his hands up and said . . . 'what would you do?'" Then, according to the trooper, appellant

indicated that he was, in fact, driving the vehicle, and that the rear end locked up and he believed the drive shaft fell out, and the vehicle rotated and came to rest in the ditch. And that he had fled the scene because he was drunk. And then he said, 'what would you do?'

Trooper Grinnan placed appellant under arrest. Following the arrest, a person who was only identified as "Trooper Sutka" arrived at the scene of the accident and took possession of the rifle.

## STANDARD OF REVIEW

In reviewing a denial of a motion to suppress, we accept the findings of fact made by the circuit court, unless they are clearly erroneous. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Marr v. State,* 134 Md.App. 152, 163, 759 A.2d 327 (2000). Our review is based solely upon the record developed at the suppression hearing, and we review that record in the light most favorable to the prevailing party. *See Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389 (2001); *Trott v. State,* 138 Md.App. 89, 97, 770 A.2d 1045 (2001). We

review *de novo*, however, all legal conclusions, making our own independent constitutional determination of whether the search in question was lawful and whether appellant's statement was lawfully obtained. *See Wengert*, 364 Md. at 84, 771 A.2d 389; *Trott*, 138 Md.App. at 97, 770 A.2d 1045.

## ADMISSIBILITY OF THE KEY

While Appellant concedes that "the trooper had reason to feel [his] clothing for weapons," he contends that the trooper exceeded the limits of a *Terry* frisk by "taking a key from [his] pocket." He argues that because the " 'incriminating nature of the object [the key] was not immediately apparent' " to the trooper, the search was not constitutionally permissible under the plain feel doctrine, as promulgated by the Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

In *Dickerson*, the Supreme Court extended the boundaries of the *a* "patdown" to allow seizure of contraband discovered during a lawful *Terry* search as long as the contraband's "incriminating character is immediately apparent" by sight or touch. 508 U.S. at 375, 113 S.Ct. 2130. But if the incriminating nature of the item cannot be discerned without further physical investigation, then the seizure of the object cannot be justified under the "plain view" doctrine or its corollary, "plain feel." *See id.*

In support of his claim that the "incriminating nature" of the key was "not immediately apparent," as required by a "plain feel" seizure, appellant cites the following testimonial excerpt to show that Trooper Grinnan did not know, at the time he reached into appellant's pocket, that the key he felt, during the pat down, was even a car key, let alone the key to the disabled van:

[PROSECUTOR:] Did you take any precautions as a result of having seen the weapon on the back seat?

[TROOPER GRINNAN:] Yes, I did. I asked Mr. Conboy if he had any other weapons in his possession, and he indicated that he did not. I patted him down, his external

garments, to make sure that he did not have any other kind of weapons that maybe associated with deer hunting, such as buck knives, those sorts of things, that are commonly carried by hunters.

[Prosecutor:] What was Mr. Conboy wearing?

[TROOPER GRINNAN:] He had shorts and a dirty tee shirt on, I believe.

[PROSECUTOR:] Did you locate any other weapons on him?

[TROOPER GRINNAN:] No weapons.

[PROSECUTOR:] Did you locate any other evidence on him that would relate to the initial incident that you were investigating?

[TROOPER GRINNAN:] That is correct.

[PROSECUTOR:] What did you learn?

[TROOPER GRINNAN:] During a pat down, I believe—I have to refer to my report, I believe it was his back pocket of his shorts—that's correct, in the rear pocket of his shorts, I felt what I immediately recognized as a car key, or key of some type, not necessarily a car key, but it was a key. And based on the fact that the collision had occurred and I had a vehicle that was unattended in the ditch, I retrieved the key from his pocket, and I observed that it was a Ford key, belonging to a Ford motor vehicle.

[PROSECUTOR:] All right. What did you do with the key?

[TROOPER GRINNAN:] At this point, Trooper Sutka had arrived. No, correction, Trooper Sutka had not arrived at this point. I checked the Ford key with the van and turned the ignition over and discovered that the key was, in fact, the key to the van.

The trial court disagreed with appellant's conclusion. It upheld the search, stating that "in the process of the pat down, if [the trooper] discovers something that is certainly relevant, such as the key that may fit the vehicle that they can't find the driver for, [the trooper] has the right to go ahead and seize the key." We agree with the circuit court.

The trooper's seizure of the key did not violate the Fourth Amendment—but not for the reasons espoused by that court.

■ The plain feel doctrine, although often described as a corollary of the plain view doctrine, poses special problems of its own. In a nutshell, plain feel is more intrusive yet less conclusive than plain view. But we need not reach the question of whether the seizure of the key was justifiable under that doctrine today, because the search at issue is sustainable under another exception to the warrant requirement of the Fourth Amendment. It was a search incident to a lawful arrest. And, on that ground, we shall affirm the decision of the circuit court. *See* Md. Rule 8–131(a); *Modecki v. State,* 138 Md.App. 372, 771 A.2d 521 (2001).

■ We begin our discussion of the propriety of the search at issue by observing that a police officer with probable cause to believe that a suspect has or is committing a crime may arrest the suspect without a warrant. *See Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). This is true in cases where the person "has committed even a very minor criminal offense," such as a traffic violation. *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Once lawfully arrested, police may search "the person of the arrestee" as well as "the area within the control of the arrestee" to remove any weapons or evidence that could be concealed or destroyed. *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Moreover, as long as police have probable cause to arrest before they search the arrestee, it is not "particularly important that the search precede the arrest rather than vice versa." *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *see Lee v. State,* 311 Md. 642, 668, 537 A.2d 235 (1988).

In his comprehensive multi-volume work, *Search and Seizure,* Professor Wayne R. LaFave explains why federal[4] and

---

4. *See, e.g., United States v. Armstrong,* 16 F.3d 289 (8th Cir.1994); *United States v. Miller,* 925 F.2d 695 (4th Cir.1991); *United States v.*

state [5] courts have rejected any test that would require that an arrest always precede the search at issue, before invoking this exception. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* vol. 3, § 5.4, at 152–55 (3d ed. 1996 & Supp.2004). He begins his explanation by quoting from the concurring opinion of Justice John Marshall Harlan in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and the opinion authored by Justice Roger Traynor in *People v. Simon,* 45 Cal.2d 645, 290 P.2d 531 (1955).

Their words bear repeating. In his *Sibron* concurrence, Justice Harlan observed:

> Of course, the fruits of a search may not be used to justify an arrest to which it is incident, but this means only that probable cause to arrest must precede the search. If the prosecution shows probable cause to arrest prior to a search of a man's person, it has met its total burden. There is *no* case in which a defendant may validly say, "Although the officer had a right to arrest me at the moment when he seized me and searched my person, the search is invalid because he did not in fact arrest me until afterwards."

*Sibron,* 392 U.S. at 77, 88 S.Ct. 1889 (Harlan, J., concurring).

"[T]he proposition stated by Justice Harlan," Professor LaFave points out, "does not broaden the power of the police, but instead gives some added measure of protection to those reasonably but mistakenly suspected of criminal behavior." *See* LaFave, *supra,* vol. 3, § 5.4, at 154. That point, the professor notes, was also made by Justice Traynor in *People v. Simon,* 45 Cal.2d 645, 290 P.2d 531 (1955). *See id.* In that case, Justice Traynor wrote:

---

*Hernandez,* 825 F.2d 846 (5th Cir.1987); *United States v. Gay,* 774 F.2d 368 (10th Cir.1985); *United States v. Chatman,* 573 F.2d 565 (9th Cir.1977).

**5.** *See, e.g., Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988); *State v. Melton,* 412 So.2d 1065 (La.1982); *State v. Valenzuela,* 121 Ariz. 274, 589 P.2d 1306 (1979); *Wright v. State,* 418 So.2d 1087 (Fla.Dist.Ct.App. 1982); *People v. Rossi,* 102 Ill.App.3d 1069, 58 Ill.Dec. 291, 430 N.E.2d 233 (1981).

[I]f the officer is entitled to make an arrest on the basis of information available to him before he searches, and as an incident to that arrest is entitled to make a reasonable search of the person arrested and the place where he is arrested, there is nothing unreasonable in his conduct if he makes the search before instead of after the arrest. In fact, if the person searched is innocent and the search convinces the officer that his reasonable belief to the contrary is erroneous, it is to the advantage of the person searched not to be arrested. On the other hand, if he is not innocent or the search does not establish his innocence, the security of his person, house, papers, or effects suffers no more from a search preceding his arrest than it would from the same search following it.

*Simon,* 45 Cal.2d at 648, 290 P.2d 531.

And that reasoning led the Supreme Court to declare, in *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), that, "where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."

In *Rawlings,* during a warrant-authorized search of a house, one of the occupants was ordered to empty her purse. 448 U.S. at 101, 100 S.Ct. 2556. When she did, it was observed to contain controlled substances. *Id.* The occupant then turned to Rawlings, who was standing nearby, and told him "to take what was his." *Id.* Rawlings "immediately claimed ownership" of the drugs. *Id.*

The police arrested Rawlings but not before searching him and finding $4,500 and a knife. *Id.* The pre-arrest search of Rawlings' person was subsequently upheld as a valid search incident to an arrest, regardless of the fact that it had preceded his arrest, a distinction which the Court, as previously noted, did not feel was "particularly important." *See id.* at 111, 100 S.Ct. 2556.

The lesson of *Rawlings* has not been lost on Maryland's appellate courts. When the issue of such pre-arrest searches

has arisen, they have upheld them so long as a lawful arrest followed the search. *See Lee,* 311 Md. at 668, 537 A.2d 235; *Wilson v. State,* 150 Md.App. 658, 822 A.2d 1247 (2003); *Anderson v. State,* 78 Md.App. 471, 553 A.2d 1296 (1989). As to how quickly the arrest must follow the search, Maryland's appellate courts have approved searches when the arrest occurred immediately after the search, *see, e.g., Lee,* 311 Md. at 668, 537 A.2d 235; *Wilson,* 150 Md.App. at 674, 822 A.2d 1247, and when it occurred "a few minutes" later. *Anderson,* 78 Md.App. at 487, 553 A.2d 1296.

As in *Rawlings,* the pre-arrest search at issue here was a valid search incident to a lawful arrest. In response to a question at the suppression hearing, Trooper Grinnan stated that he had arrested appellant for "leaving the scene of a property damage collision." There is no provision of the Maryland Code that authorizes an officer to arrest a driver for leaving the scene of an accident where the property damage caused by the accident is confined to the driver's vehicle. But that misstatement is of no consequence. It does not vitiate the lawfulness of appellant's arrest, as that arrest "was otherwise justified." *Nieves v. State,* —— Md.App. ——, ——, —— A.2d ——, 2003 WL 23004983, at *5 (2003).

Moreover, it is clear from the trooper's testimony that his response was never intended to be a complete statement of all of the reasons he arrested appellant. Indeed, he testified that, before arresting appellant, appellant had confessed to driving while under the influence of alcohol. The clear implication of the trooper's testimony was that he arrested appellant for more than simply "leaving the scene of a property damage collision."

In any event, at the time of appellant's arrest, the trooper had probable cause to arrest appellant for driving under the influence of alcohol before he searched him and, as in *Rawlings,* that arrest "followed quickly on the heels" of the search at issue.[6] Before Trooper Grinnan even encountered appel-

---

6. That the trooper did not actually observe appellant driving the van is of no consequence. Section 26–202(a) of the Transportation Article states in part:

lant, he observed that someone had crashed a van, strewn with alcoholic beverages, into a ditch and then apparently abandoned it. He also believed that the driver of the van was probably in the area as he observed, upon his return from a brief meeting with the owner of the van's tags, that the property that had been in the van was now gone. And, from the information that he obtained from the tags owner, he obviously believed that there was a reasonable possibility that "David Conboy" was the driver of the van at the time of the accident. That is why, we can presume, he approached the cab's passenger asking "Mr. Conboy?"

When a taxicab pulled up and its passenger steadfastly refused to look in the trooper's direction, notwithstanding the uncommon sight of a badly damaged van and a well-lit police car, the trooper understandably suspected that this individual might be the "David Conboy" he was seeking. So he approached appellant, inquiring "Mr. Conboy?" whereupon appellant unwittingly confirmed the trooper's suspicions by responding, "I'm not David Conboy."

Moreover, appellant was at the scene of the accident just after the removal of property from the van. He arrived there in a taxicab, providing the trooper with an explanation of how the van's driver was able to leave the scene of the accident. At that time, appellant admitted to owning the property in the back seat of the cab, which was the sort of property, particularly the bottle of vodka, that had been removed from the van. And, as if that were not enough, he appeared to be intoxicated and, given the presence of full and empty containers of alcohol inside the van and the condition of the van, the trooper had

---

(a) In general: A police office may arrest without a warrant a person for a violation of the Maryland Vehicle Law, including any rule or regulation adopted under it, or for any violation of any traffic law or ordinance of any local authority of this State, if:

(3) The officer has probable cause to believe that the person has committed the violation, and the violation is any of the following offenses:

(i) Driving or attempting to drive while under the influence of alcohol, while impaired by alcohol, or in violation of an alcohol restriction. . . .

every reason to believe the van's driver was too. In sum, the trooper had probable cause to believe that the badly damaged van, which was littered with alcoholic beverages, had apparently been in an alcohol-related accident and that the still inebriated appellant had been the driver of that vehicle. In short, the officer had probable cause to arrest appellant.

Not only was the search of appellant performed after the trooper had probable cause to arrest, but appellant's arrest occurred within minutes of that search, satisfying both requirements of *Rawlings:* that there was probable cause to arrest and that the arrest "followed quickly on the heels" of the search. Once the trooper retrieved the key, he went directly over to the van, placed the key in its ignition, and then returned to place appellant under arrest. As the seizure of the key and the arrest of appellant occurred within minutes of *each* other, the arrest did in fact, as required by *Rawlings,* follow quickly on the heels of the search. *See, e.g., Anderson,* 78 Md.App. at 487, 553 A.2d 1296. It was therefore a lawful search incident to an arrest.

## ADMISSIBILITY OF THE STATEMENT

Appellant contends that the trial court erred in denying his motion to suppress his statement to police that he was drunk when he crashed the van and fled the scene. He argues that, following the seizure of the van's key from his pocket, the investigatory stop evolved into a custodial detention. That change, he maintains, required that he be given his "Miranda warnings" before any further words were exchanged between him and the police. Because these warnings were not given, he claims that his admission of intoxication should have been suppressed.

In the landmark case of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that statements obtained during the "custodial interrogation" of a suspect were not admissible unless he or she had been previously informed of certain constitutional rights. The Court then defined "custodial interrogation" as "questioning

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. Eponymously dubbed *"Miranda* warnings," they require the suspect be told that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.; see also Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). But these warnings are required only when the person questioned is both in custody and about to be interrogated. *See Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526.

■■ To determine if a person is in custody, the trial court must make "two discrete inquiries." *State v. Rucker,* 374 Md. 199, 210–11, 821 A.2d 439 (2003). First, the court must consider the totality of the circumstances surrounding the interrogation, such as when and where it took place, how long it lasted, how many officers were present, what the police and the defendant said and did, and whether physical restraints or force was used to detain the defendant. *See id.* at 208, 821 A.2d 439; *see also Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526. And then, in light of those circumstances, the court must consider whether a reasonable person would have felt "he or she was not at liberty to terminate the interrogation and leave." *Rucker,* 374 Md. at 210–11, 821 A.2d 439. If the answer to that question is "yes", then the questioning was custodial. *See id.* On the other hand, what an officer may or may not feel about the nature of the detention is irrelevant. A police officer's unarticulated subjective views that the person questioned is a suspect and that he is not free to leave have no bearing on whether the suspect is in custody for purposes of *Miranda." See Stansbury,* 511 U.S. at 323–24, 114 S.Ct. 1526.

■■ We next turn to the second part of the *Miranda* test: whether the statement at issue was elicited by an interrogation. "Interrogation" includes not only "express questioning" but "its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297

(1980). The "functional equivalent" of interrogation includes "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. In determining whether the police should have known that their words or actions would elicit an incriminating response from the suspect, courts must consider the intent of the police in making the statement or performing the action, whether the police had knowledge of a suspect's "unusual susceptibility" to persuasion, and whether the police invited the suspect to respond to their statements or actions. *See id.* at 302, 100 S.Ct. 1682. Indeed, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself," and a suspect's incriminating response must be "the product of words or actions on the part of police." *Id.* at 301, 303, 100 S.Ct. 1682.

In *State v. Rucker*, 374 Md. 199, 821 A.2d 439 (2003), the Court of Appeals considered whether Rucker was in custody for Miranda purposes when he was detained briefly in a public parking lot. In this case, the defendant was suspected of possessing and distributing crack cocaine in Prince Georges County. *Rucker*, 374 Md. at 203, 821 A.2d 439. Based upon a tip from a confidential informant that Rucker was distributing crack cocaine and would be at particular shopping center, the police were at the shopping in question on the date and at the time given by the informant. *Id.*

Spotting Rucker, from the description given by the informant, the police stopped him in the shopping center parking lot as he was getting into his car. *Id.* at 204, 821 A.2d 439. One of the officers, armed and in uniform, asked him for his license and vehicle registration. Rucker complied and handed them to the officer. *Id.* Then, without first advising him of his "*Miranda* rights," two narcotics detectives approached Rucker and asked him "if he had anything that he was not supposed to have." *Id.* Rucker replied, "Yes, I do, it's in my pocket ... [its] cocaine." *Id.* After retrieving the cocaine from his pocket, the police arrested Rucker. *Id.*

Affirming the trial court's decision to suppress Rucker's statements, this Court held that the parking lot detention of Rucker was more than an investigatory stop because it had become the functional equivalent of an arrest by the time Rucker admitted to possessing cocaine, requiring *Miranda* warnings. *See id.* The Court of Appeals, however, disagreed. *See id.* Observing that the entire incident occurred in a public place, that it took place within a short period of time, that there were only three officers present, that the return of the license and registration was not conditioned upon cooperation, and that only a single, non-coercive question was asked of Rucker before he made the statements at issue, the Court of Appeals found that the defendant "was not in custody for purposes of *Miranda* because he was not restrained to a degree associated with formal arrest." *Id.* at 212, 221, 821 A.2d 439. Consequently, the police were not required to give the "*Miranda* warnings" to appellant. *See id.* at 221, 821 A.2d 439.

 Like Rucker, appellant was not subject to "custodial interrogation" because he was not in custody at the time he admitted to being drunk. When Trooper Grinnan stopped the taxi, he executed a lawful *Terry* stop to investigate appellant's presence and unusual behavior at the accident scene. That investigatory stop had not evolved into a formal arrest or a "restraint on freedom of movement of the degree associated with a formal arrest" before appellant made the statement at issue. *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526. Also, like Rucker, appellant was detained on a busy public street during daylight hours, his detention lasted for a short period of time, and there was only one trooper at the scene conducting the investigation. And, finally, prior to the statement, appellant was not placed in handcuffs or otherwise physically restrained; he merely was asked to sit on the ground. That the trooper considered appellant a suspect and that he felt appellant was not "free to leave" have no bearing on the custody issue because the trooper did not communicate those views to appellant. Thus, the totality of the circumstances surrounding appellant's statement indicate that appellant was not in custo-

dy for *Miranda* purposes when he made he made the statement at issue.

■ Having determined that appellant was not in custody at the time that he admitted to driving while intoxicated, we now turn to the question of whether that statement was "the product" of interrogation, either "express questioning or its functional equivalent." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682. Clearly, it was not. While appellant sat on the ground as instructed, the trooper walked over to the van and placed the key in the ignition. When the key proved to be the van's ignition key, the trooper walked back, stating "it's funny, the key fits." That statement was merely an observation made without inviting a response. *See Innis,* 446 U.S. at 302–03, 100 S.Ct. 1682 (finding that a conversation between two police officers regarding the location of the gun used in a robbery and murder, which took place in Innis' presence after he was arrested, was not interrogation because they were "a few off hand remarks" to which "no response was invited"). Appellant nonetheless did respond, stating that "he fled the scene because he was drunk." Moreover, there is no evidence that the trooper intended to elicit an incriminating response from appellant or should have known that appellant would respond to his remark. Accordingly, we find that appellant's statement was not the product of interrogation, and therefore the trial court properly admitted his statement into evidence.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

Dissenting Opinion by SALMON, J.

The majority's conclusion concerning the legality of the seizure of the key from Conboy's rear pocket was based on an exception to the warrant requirement never mentioned by either party at any stage of this case. In fact, the State in its brief even conceded that "this case involves the proper application of the 'plain feel doctrine,' discussed most notably by the United States Supreme Court in *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)."

The majority holds that the search was justified as "incident to" a valid arrest. In my view, that exception to the warrant requirement was justifiably ignored by the State because prior Maryland precedent demonstrates its inapplicability.

## I.

### Facts Known Prior to Appellant's Arrival at the Accident Scene in a Cab [7]

On May 28, 2002, at 6:02 p.m., Trooper David Grinnan responded to the scene of a single-vehicle accident at Route 50 and Silver Point Lane in West Ocean City, Maryland. The vehicle involved in the accident was a 1978 Ford van, which was facing eastbound on the westbound side of the road and was extensively damaged, with its "contents shaken up extensively." Inside the van, Trooper Grinnan saw stereo equipment, construction tools, and an extension cord. The trooper also observed "alcohol containers in the vehicle, some carrying alcohol, and the alcohol had spilled leaving a strong odor of alcohol." As far as the record reveals, he observed nothing else concerning alcohol containers.

Trooper Grinnan discovered that the tag for the 1978 Ford van belonged to a 1985 Chevrolet, which was registered to a "Mr. Wolf," [8] who lived nearby.

Trooper Grinnan went to Wolf's home to question him about the tags. Wolf told Trooper Grinnan that the license plates to the 1985 Chevrolet had been hidden under a sofa seat at his brother's house; he also said that David Conboy had been staying at his brother's house. In the trooper's words, Wolf "indicated that Mr. Conboy had gone under the sofa, to his belief, and removed the tag and placed it on the van." So far as is reflected in the record, Wolf did not say when David

---

7. The facts set forth are based upon the testimony of Trooper David Grinnan, the lone witness at the suppression hearing.

8. The record does not contain Wolf's first name.

Conboy placed the tag on the vehicle, nor did he provide a description of Conboy.

Trooper Grinnan's trip to Wolf's house and back to the accident scene took "30 to 40" minutes.[9] He returned to the accident scene at "6:40–6:45 [p.m.]," whereupon he discovered that construction tools, stereo equipment, and an extension cord that he had seen thirty or forty minutes previously were missing. This led Trooper Grinnan to believe that "whoever had wrecked the van" had retrieved some of the property and was likely to still be in the vicinity.

The trooper did not testify that from the information he obtained from Wolf he believed that there was a "reasonable possibility" that a "David Conboy was more than likely the driver of the van at the time of the accident." *Cf.* op. at 368, 843 A.2d at 225. Moreover, as far as the record shows, he possessed no facts that he could have utilized to arrive at the latter conclusion. After all, Wolf simply said that, to his belief, David Conboy put the tag on the van.

Insofar as it concerns Trooper Grinnan's knowledge regarding the relationship between alcohol and the accident, the only thing the trooper knew prior to appellant's arrival was that the van had been transporting alcohol. No "open containers" of alcohol were observed in the van except insofar as broken containers can be considered to be "open."

---

9. On cross-examination, Trooper Grinnan testified as to the sequence of events as follows:

Q. So ... you ... initially arrived on the scene, and then you left about thirty or forty minutes; is that correct?

A. That's correct.

Q. And you didn't see anybody when you were initially on the scene?

A. No, I did not.

Q. No one came up to you and said that they saw the accident occur or anything like that?

A. No.

Q. So you came back to the scene about thirty or forty minutes later and went and searched the van again. And at some point you observed a taxi, and you said that the taxi was about thirty yards away—

A. That's correct.

## II.

### *Facts Learned by Trooper Grinnan from the Time Appellant Arrived at the Scene to the Conclusion of the Search*

The appellant arrived near the accident scene as the front-seat passenger in a cab. Although the taxi driver looked in the direction of the wrecked van and at Trooper Grinnan, appellant looked in the opposite direction, which in the trooper's opinion was both unusual and suspicious, because "most people are nosy." The trooper reasoned: (1) valuable construction equipment like that in the wrecked van was unlikely to be abandoned by its possessor; (2) it would take "more than one trip" to retrieve all the construction equipment; (3) whoever had driven the van was likely to still be "in the area"; (4) taking a cab would be a good way to transport the construction equipment; (5) therefore, the incurious passenger in the cab might well be the driver of the wrecked van. That reasoning led Trooper Grinnan to signal the cab driver to pull the taxicab to the side of the road so that he could investigate further.

When he approached the passenger side of the cab, the officer said "Mr. Conboy." The passenger replied, "I'm not David Conboy." The passenger then said his name was "Mitch Unson." Upon further questioning, he gave his name as "George Mitchell Unson." In fact, the passenger's real name was David Nolan Conboy, but this was not discovered immediately.[10]

Trooper Grinnan then asked appellant questions concerning whether he had been driving the van, where he hailed the cab, his purpose for being in the area, and whether he knew anything about the accident. The record does not reveal appellant's responses to those questions.

---

**10.** According to an agreed statement of facts introduced *at trial*, Conboy's true identity was not discovered by the police until after Conboy had been taken back to police headquarters, booked, and released.

During this period of questioning, Trooper Grinnan noticed that appellant appeared intoxicated and smelled strongly of alcohol. Also, the trooper observed a 270–caliber deer rifle and a bottle of Popov vodka on the backseat of the taxicab. Appellant said that those items belonged to him.

Trooper Grinnan told appellant to step from the cab. After appellant complied, the trooper asked him if he had any other weapons in his possession. Conboy responded in the negative. Trooper Grinnan then performed a pat-down of appellant's exterior clothing to make sure he did not have any weapons associated with deer hunting, such as a buck knife or similar weapons. He found no weapons but did feel a key "of some sort" in appellant's rear pants pocket. He extracted the key and saw that it "belonged to a Ford motor vehicle."

The trooper explained why he took the key out of appellant's pocket by saying: "Based on the fact that the collision had occurred and I had a vehicle that was unattended in the ditch, I retrieved the key from his pocket." From that answer, coupled with what he did immediately thereafter, the only logical inference that can be drawn is that Trooper Grinnan extracted the key so that he could find out whether his suspicion (that the incurious cab passenger was the driver of the wrecked van) was accurate.

### III.

#### *Testimony at Suppression Hearing as to What Happened After the Retrieval of the Key*

Trooper Grinnan walked over to the wrecked van, tried the key in the ignition, and found that the key fit. He then walked back to where appellant was sitting and said, "It's funny, the key fits." Appellant then confessed that he had been driving the van and had fled the accident scene because he was drunk. Appellant was then arrested for "leaving the scene of a property damage accident." As the majority correctly notes, "There is no provision of the Maryland Code that authorizes an officer to arrest a driver for leaving the scene of [an] accident where the property damage caused by the

accident is confined to the driver's vehicle." (Op. at 367, 843 A.2d 224.) Moreover, as far as I can determine, it is neither a crime nor a traffic violation to leave the scene of a one-car accident of this type.[11]

Trooper Grinnan did not learn the identity of the owner of the wrecked vehicle until several days after appellant's arrest.

At the suppression hearing, neither counsel, the motions judge, nor Trooper Grinnan even mentioned the fact that appellant faced an alcohol-related charge. The closest anyone came to the subject was when appellant's counsel said that appellant faced "traffic charges."

## IV.

### Probable Cause to Arrest

"Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground for belief of guilt.

---

11. The Transportation Article of the Maryland Code does have provisions sanctioning a driver of a vehicle who leaves the scene of an accident without fulfilling his or her duty to give aid (if bodily injury is involved) or information if an unattended vehicle or other property is damaged. *See* Md.Code Ann., Transp. II §§ 20–103 to 20–105 (1977, 2002 Repl.Vol.). But none of these sections is here applicable.

For Fourth Amendment purposes, the legality of an arrest is determined under State law, "absent any federal statute to the contrary." *State v. Evans*, 352 Md. 496, 518, 723 A.2d 423 (1999). Under Maryland law, a warrantless arrest may be made for any offense committed in the officer's presence. Additionally, a warrantless arrest may be made for any felony, whether committed in the arresting police officer's presence or not, if the officer has probable cause to believe that a felony has been committed and the suspect committed it. In regard to misdemeanors and traffic offenses, the rule is different. Save for certain exceptions spelled out by statute, an officer may not arrest a suspect without a warrant for misdemeanors or traffic offenses not committed in the officer's presence, even if the officer has probable cause to believe the suspect has committed the crime or violation. There are, however, exceptions to this rule. For misdemeanors listed in section 2–203(b) of the Criminal Procedure Article of the Maryland Code (2001) and for traffic offenses listed in section 26–203 of the Transportation Article of the Maryland Code (1977, 2002 Repl.Vol.), a police officer may arrest if he/she has probable cause to believe that the suspect has committed the offense out of his/her presence. Driving while under the influence is one of the traffic offenses that comes within the exception.

A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person arrested. Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion. *To determine whether an officer had probable cause in a specific case, here probable cause to search, "the reviewing court necessarily must relate the information known to the officer to the elements of the offense that the officer believed was being or had been committed." DiPino v. Davis,* 354 Md. 18, 32, 729 A.2d 354, 361 (1999).

*State v. Wallace,* 372 Md. 137, 148–50, 812 A.2d 291 (2002), *cert. denied,* —— U.S. ——, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004) (emphasis added) (some citations omitted).

The rule that, in considering whether the "search incident" exception is applicable, the court should direct its probable cause focus upon "the information known to the officers ... [regarding] the elements of the offense that the officer believed was being or had been committed" is here important. The majority ignores the issue of what crime Trooper Grinnan actually believed had been committed prior to the search and focuses, instead, on what offense Trooper Grinnan *might have* believed had been committed. *See* op. at 367–68, 843 A.2d at 225. In my view, this focus is misdirected.

Trooper Grinnan, the sole witness at the suppression hearing, gave no hint during his testimony that at any time prior to appellant's confession he believed that appellant had driven the van while under the influence of alcohol. The evidence showed that prior to the search, Trooper Grinnan suspected

that appellant might have been the driver of the wrecked van and that, if he was the driver, he had left the scene of a property-damage accident, which he thought was a crime. Self-evidently, a search incident to an arrest for behavior that is not a crime is invalid.

Even if the majority is correct when it focuses upon the issue of whether there was probable cause to arrest appellant (prior to the search) for driving under the influence of alcohol, probable cause for an arrest as to that charge did not exist.

The majority's discussion as to why it concludes otherwise is set forth at Pages 367–69, 843 A.2d at 224–25 of the opinion. Two central "facts" advanced in support of the conclusion that Trooper Grinnan had probable cause to believe that appellant had wrecked the van are: (1) Trooper Grinnan believed from information he received from Wolf that there was a "reasonable possibility" that a David Conboy was more than likely the driver of the van at the time of the accident, op. at 368, 843 A.2d at 225, and (2) appellant's statement that he was *not* David Conboy "unwittingly confirmed the trooper's suspicions" that he was David Conboy. *Id.* Trooper Grinnan never said that his conversation with Wolf led him to believe that, more than likely, David Conboy. drove the van at the time of the accident. Because the record is so sparse as to what he was told by Wolf, we have no way of knowing whether he, in fact, held that belief. For all we know, Trooper Grinnan's question may have been a "shot in the dark." Moreover, Trooper Grinnan never said that appellant's "I'm not David Conboy" response confirmed appellant's identity as David Conboy. The *only* testimony regarding the "I'm not David Conboy" answer was as follows:

Q. Did you initially make contact with the cab driver?

A. I initially made contact via the passenger's side of the vehicle. So my first contact is with the defendant.

Q. And what did you say?

A. I said Mr. Conboy.

Q. And what was his response.

A. He said I'm not David Conboy, I'm George, or I'm Mitch Unson, is that he had said to me. Later he gave a

full name of George Mitchell Unson, who I later determined was his stepbrother.

Q. And he used the name David Conboy when you had just used the last name?

A. Yes, he did.

Depending on factors such as the size of the community where inquiry is made and how common the surname, there *may* be some circumstances where one can infer, legitimately, that a denial of one's identity means the opposite. For instance, if an officer confronts a sober adult on the streets of New York City and says, "Mr. Smith?" and the response is, "I'm not Horatio Smith," one might possibly infer that the person is, most likely, Horatio Smith. But if, as here, the surname is uncommon, the locale is suburban-residential (about one-third of the way between Ocean City and Berlin, Maryland), and the person responding is drunk, the suggested inference cannot be drawn legitimately. And, in any event, there is *no indication* that Trooper Grinnan drew the suggested inference,[12] at the point appellant was searched. After Trooper Grinnan got that response, he asked appellant whether he had been driving the van, whether he knew anything about the accident, where he hailed the cab, and why he was in the area. Based on this record, we do not know what appellant said in response to the questions, much less what Trooper Grinnan made of appellant's responses.

What we do know is that Trooper Grinnan said that at the time of the search, he merely "had a feeling [that there] was a possibility that he [appellant] was a suspect." [13] Based on that

---

12. At appellant's *trial*, it was revealed that Trooper Grinnan charged appellant under the name of George Mitchell Unson and that it was not until he was released from police custody that it became known that appellant's real name was David Conboy. Thus, as a historical fact, we know that appellant's "I'm not David Conboy" response did not, in fact, "confirm his identity" in Trooper Grinnan's mind.

13. On cross-examination, the following colloquy took place as to what Trooper Grinnan thought as he asked appellant questions immediately prior to the search:

answer, coupled with all the other circumstances, I believe that, at the time of the search, Trooper Grinnan merely had, at most, a reasonable suspicion, not probable cause, to believe appellant had wrecked the van.[14]

Even assuming that the trooper had probable cause to believe that appellant wrecked the van, I do not believe that the trooper, prior to appellant's confession, had probable cause to believe that appellant had driven the van *while under the influence of alcohol.* The majority lists several facts in support of a contrary conclusion, *viz:* (1) appellant "appeared intoxicated" when Trooper Grinnan first saw him, which was forty to forty-five minutes after Trooper Grinnan first arrived at the accident scene; (2) the bottle of vodka in the back seat of the cab "was the sort of property that had been removed from the van"; and (3) given the fact that appellant was then intoxicated, coupled with the fact that the trooper saw "full and empty containers of alcohol," the trooper "had every

---

Q. Okay. And you also indicated in your report that you stopped the taxicab and you began to interview the passenger who was later Mr. Conboy, so you began questioning him about, you said first you asked him his name. Did you ask him, do you know anything about the accident or—

A. Yes, I went through the standard questions of, you know, were you driving this van, what is your business over here, where did you get picked up, that kind of stuff. And it was actually my phone call to the Sunshine Cab Company is how I located all of the equipment that was in his van.

Q. So you were asking him questions about the accident?

A. Yes.

Q. It was at that point you had a feeling, this is the guy based on all of those things?

A. Yes, *I had a feeling it was a possibility that this person is a suspect, yes.*

(Emphasis added.)

14. Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

reason to believe" that the person who rode in the cab was intoxicated when the accident occurred. Op. at 368–69, 843 A.2d at 225.

There was no evidence that alcohol containers were removed from the van post-accident (Fact 2). The evidence concerning alcohol containers was that Trooper Grinnan saw "alcohol containers in the vehicle, some carrying alcohol." From this, it can be inferred that some of the alcohol containers did not carry alcohol, but we do not know whether that was because the containers were broken in the crash or whether someone drank their contents. Moreover, even if one were to conclude that there was at least one empty container whose contents had been imbibed, we do not know if the trooper saw one empty container or ten, nor do we know what was in the containers. This leaves the facts that were proven: The appellant smelled strongly of alcohol and "appeared intoxicated" when Trooper Grinnan saw him at the accident scene. The accident, of course, took place before Trooper Grinnan arrived. Even if one were to assume that the accident occurred just moments before the trooper arrived (an unlikely scenario), I do not believe that one can infer legitimately that a person who presently "appeared intoxicated" was therefore intoxicated forty to forty-five minutes previously. To make such an inference, more information would be needed, such as information concerning what alcoholic beverage was imbibed and the amount.

> Probable cause is lacking if the circumstances relied on are "susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities." *United States v. Kandlis*, 432 F.2d 132, 136, (9th Cir.1970), quoting *United States v. Selby*, ... 407 F.2d [241,] 243 [ (1977) ].

*United States v. Moore*, 483 F.2d 1361, 1363 (9th Cir.1973).

At the time appellant was searched, appellant's words and actions were susceptible of a variety of explanations inconsistent with having driven the van while under the influence of alcohol. Thus, at that point, Trooper Grinnan did not have probable cause to arrest him for that traffic offense.

# V.

## *The Timing of the Arrest*

Although the precise timing is not shown in the record, appellant's arrest probably took place only one or two minutes after the search. Therefore, the search was "essentially contemporaneous" with the arrest.[15] Accordingly, I concede that the temporal element of the "search incident" exception was met. But as this Court said about two and one-half years ago, meeting the temporal element is not enough. *State v. Funkhouser*, 140 Md.App. 696, 782 A.2d 387 (2001).

In *Funkhouser*, the defendant's vehicle was stopped for a traffic violation; the police officer ordered the defendant out of the car, and the defendant complied with the order. *Id.* at 108, 782 A.2d 387. The officer then had a "cocaine-sniffing canine" scan the vehicle for the presence of cocaine. *Id.* at 708, 782 A.2d 387. The dog gave a positive alert at both the front passenger door and the driver's door. *Id.* The defendant's vehicle was then searched, but no drugs were found. *Id.* at 711, 782 A.2d 387. Afterward, the police officer approached the defendant, who was standing near his car wearing a "fanny pack" around his waist. *Id.* at 711–12, 782 A.2d 387. The officer searched the fanny pack and found what he believed to be cocaine. *Id.* at 712, 782 A.2d 387. Funkhouser was arrested immediately after the cocaine was found. *Id.* at 701, 782 A.2d 387.

On appeal, the State argued, and we agreed, that prior to the search of the fanny pack the police had probable cause to arrest Funkhouser as a result of the positive canine alert. *Id.* at 721, 782 A.2d 387. The State also argued that the "tight

---

**15.** In *Ricks v. State*, 322 Md. 183, 191 n. 2, 586 A.2d 740 (1991), the Court said:

The search in this case would not have been invalid, even if Ricks was arrested after the search of the bag. As long as the search and the arrest are essentially contemporaneous, a search may be analyzed under the principles governing searches incident to arrest. *Lee* [*v. State* ], 311 Md. [642,] 668, 537 A.2d 235 [ (1988) ], citing *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Anderson v. State*, 78 Md.App. 471, 481–82, 553 A.2d 1296 (1989).

sequencing" between the search and the arrest made the search incident to the arrest. *Id.* at 731, 782 A.2d 387. In the subject case, the majority adopts a position identical to that advanced by the State in *Funkhouser.* Op. at 381–84, 843 A.2d at 233–34. But in *Funkhouser,* Judge Moylan, for this Court, explicitly rejected the State's position.

That the police have probable cause for a lawful arrest of a person does not in and of itself justify a warrantless search of that person. The search must be incident to an arrest itself. It may not be incident merely to good cause to make an arrest. The existence of an unserved warrant of arrest, for instance, would not justify a warrantless search of a person who is not actually arrested. As this Court observed in *DiPasquale v. State,* 43 Md.App. 574, 577, 406 A.2d 665 (1979):

*That the facts here might have established probable cause for an arrest of the appellant,* even before the baggie was seized, and for a good search incident thereto which would have produced the baggie *is beside the point. No arrest was made until after the seizure and the arrest was predicated on the observation of the thing seized.*

(Emphasis supplied). *And see Dixon v. State,* 23 Md.App. 19, 26, 327 A.2d 516 (1974) ("At the very threshold of search incident theory, the search must be incident not merely to an arrest but to a lawful arrest.").

140 Md.App. at 724–25, 782 A.2d 387.

Here, too, Conboy's arrest was predicated on the thing seized. The *Funkhouser* Court later explained, in detail, why meeting the temporal element was insufficient:

The State seeks to avoid the foreclosing effect of no arrest having been made [prior to the search] by arguing that the arrest followed the search almost immediately thereafter and was, therefore, "essentially contemporaneous" as if that tight sequencing were dispositive. *In this case it is clear, however, that no decision to arrest Funkhouser had been made and that the seizure and search of the "fanny pack" was no mere incident of an arrest already*

*in motion, even if moments behind, on a parallel track. It was, rather, the finding of suspected drugs in the "fanny pack" that was the precipitating or catalytic agent for Funkhouser's arrest in this case. There is no suggestion that Funkhouser was going to be arrested regardless of what the search of the "fanny pack" revealed. This was an arrest incident to search.*

This case is far more akin to the ostensible incident to arrest which the Supreme Court struck down in *Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990). The police then grabbed and searched a brown paper grocery bag which Smith had been carrying "gingerly" and then attempted to shield from the police. When they discovered drug paraphernalia in the bag, they immediately arrested Smith. The Supreme Court of Ohio ruled that the search was a constitutional search incident to lawful arrest. Notwithstanding the closeness in time between the search and the arrest, the search was not an incident of the arrest. The Supreme Court held:

> That reasoning, however, "justify[ing] the arrest by the search and at the same time ... the search by the arrest," just "will not do." As we have had occasion in the past to observe, "[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification." The exception for searches incident to arrest permits the police to search a lawfully arrested person and areas within his immediate control. Contrary to the Ohio Supreme Court's reasoning, it does not permit the police to search any citizen without a warrant or probable cause so long as an arrest immediately follows.

494 U.S. at 543, 110 S.Ct. 1288.

*Essential contemporaneity is a necessary condition for an out-of-sequence incident, but it is not a sufficient condition.* "Essentially contemporaneous" is not, in and of itself, a legitimating mantra.

Cases such as *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), and *Lee v. State*, 311 Md. 642, 537 A.2d 235 (1988), were cases in which *the closely*

*related acts of arresting and searching were proceeding simultaneously.* In *Anderson v. State,* 78 Md.App. at 481, 553 A.2d 1296, we fully explained the significance of being "essentially contemporaneous" as the qualifier for a departure from the ordinary time sequence.

> *[T]here is no rigid requirement that the arrest literally precede its search incident. It is enough that they are essentially contemporaneous.* The exigencies that give rise to the search incident exception in the first place—the risk of harm to the arresting officer and the risk of destruction of readily accessible evidence—sometimes compel a departure from the formal protocol. There will be occasions when the arresting officer deems it tactfully unwise to lose critical seconds or even to be momentarily distracted from his overriding necessity of "beating his opponent to the draw." Under the circumstances, it would exalt form over substance to the point of absurdity to insist that an officer clap his hand upon an arrestee's shoulder and say the operative words, "You are under arrest," before disarming and/or neutralizing a potentially dangerous target. *The paradigm might yield a dead officer. It is enough, therefore, that the search closely anticipate, contemporaneously parallel, or follow shortly after the arrest of which it is an incident.* In all three time frames, it is still an incident of the arrest. *This is the purpose of the practical requirement that a lawful arrest and its search incident need only be essentially contemporaneous.*

(Emphasis supplied).

The temporal proximity between the search and the arrest, however, does not qualify the search as an "incident" of the arrest. That is a separate consideration. *The seizing and searching of the "fanny pack" in this case was not a consequence or incident of a decision to arrest Funkhouser.* The arrest of Funkhouser, rather, was a consequence of what was found in the search of the "fanny pack," *notwithstanding the fact that the detectives may have had an alternative and independent basis for arresting him.* They

were not acting on such a basis. What was flawed was not the proximity in time between the search and the arrest, but the lack of a proper cause-and-effect relationship. It was of this causative link that we spoke in *Anderson v. State*.

The exigencies of the essentially combat situation that exempt the policeman from the formal rigidities of parade-ground sequencing do not exempt him, however, from establishing the indispensable cause-and-effect relationship between the predicate event and its incidents.... The search incident may not "bootstrap" itself by using its results to provide its own justification. No search may justify itself on the basis of what it finds.... Thus, *although the attendant search need not technically be "subsequent to," it must still be "incident to" its predicate lawful arrest.*

78 Md.App. [471,] 481–82, 553 A.2d 1296 [ (1989) ] (emphasis added).

The shortness of the time period within which the arrest followed the search in this case could not transform the arrest into the cause of the search. The search had its own independent causation. The search was not an incident to the arrest.

*Id.* at 731–34, 782 A.2d 387 (some emphasis added).

In my view, the just-quoted portions of the *Funkhouser* opinion are dispositive. Here, as in *Funkhouser*, there was no indication that appellant was going to be arrested if the fruits of the search had not revealed a key that fit the van; the search, therefore, "had its own independent causation." *Id.* at 734, 782 A.2d 387. And, unlike the situation in *Lee v. State*, 311 Md. 642, 537 A.2d 235 (1988), and *Rawlings v. Kentucky, supra*, the "related acts of arresting and searching" appellant were not "proceeding simultaneously." *Id.* at 732, 782 A.2d 387. Therefore, even if the police had probable cause to arrest appellant prior to the search, the search was not incident to his arrest.

When the State has procured evidence of guilt via the disfavored or non-preferred modality of a warrantless search, it is the State that suffers the disincentive of a

**presumption of invalidity.** It is the State that then must assume the burden of rebutting that presumption of invalidity and of proving that the warrantless search was somehow justified under one of the "jealously guarded" exceptions to the warrant requirement.

*Herbert v. State,* 136 Md.App. 458, 493–94, 766 A.2d 190 (2001).

I do not think that the State, without even attempting to do so, fortuitously produced enough evidence to show that the "search incident" exception was here applicable.[16] In my opinion, appellant's arrest was incident to the search, which is constitutionally impermissible. *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

## VI.

### *The Plain Feel Doctrine*

It was unnecessary for the majority to decide whether the "plain feel doctrine" justified extracting the key from appellant's pocket. Because I believe that the exceptions to the warrant requirement relied upon by the majority are inapplicable, the issue is addressed below.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that, as long as there is reasonable, articulable suspicion that the individual is involved in criminal activity, a search for weapons by a police officer, without probable cause or a warrant, during a brief investigatory stop is not unreasonable under the Fourth Amendment. 392 U.S. at 30–31, 88 S.Ct. 1868. Such searches, however, must be limited in scope.

The purpose of a *Terry* frisk is not to discover evidence, but rather to protect the police officer and bystanders from

---

**16.** The motions judge did not think the "search incident" exception was applicable either. He evidently believed the "plain feel" doctrine was applicable. The motions judge said:

Well, yes, there is no argument, the purpose of the pat-down is not for discovery of evidence. But if in the process of the pat-down he discovers something that he knows or feels to be relevant, he can't just ignore that, he has the right to go ahead and seize the key.

harm. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910–11. Therefore, *Terry* frisks are limited to a search for weapons that might place the officer or the public in danger. *See Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993).

*In re David S.,* 367 Md. 523, 544, 789 A.2d 607 (2002).

In Maryland, the right of a police officer, under certain conditions, to perform a *"Terry* frisk" for handguns has been codified by statute. *See* Md.Code Ann., Crim. Law § 4–206 (2002). In addition to seizing weapons found on the person during a lawful "pat-down," officers are allowed to seize contraband whose identity as such is "immediately apparent." *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

The scope of a legitimate *"Terry* frisk" was discussed recently by the Court of Appeals in the case of *In re David S., supra.* A police officer saw David S. show an object to his companion and then stuff the object in his waistband. 367 Md. at 530, 789 A.2d 607. Based on his extensive law enforcement experience, the officer believed that David S. had secreted a handgun. *Id.* David S. and his companion were stopped and frisked. When the officer touched the waistband area of David S.'s body, he felt a hard object. *Id.* Believing the object to be a gun, he lifted David S.'s shirt and saw a black object, which he extracted. *Id.* The object turned out to be a bag of cocaine. *Id.*

The Court held that the seizure of the object was legal because, when he felt the hard object, the officer had "even more reason to believe" that David S. was carrying a gun. *Id.* at 541–42, 789 A.2d 607.

*If during a lawful pat-down an officer feels an object which obviously is not a weapon, further patting of it is not permissible. See id.* at 378, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (noting that an officer's continued exploration of a suspect's pocket after having concluded that it contained no weapon was unrelated to "the sole justification of

the search [under *Terry* ] ... the protection of the police officer and others nearby. It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize ....."); *see generally* 4 WAYNE R. LA FAVE, SEARCH AND SEIZURE, § 9.5(b), at 275 (1996). The Supreme Court has made clear that *"if the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed."* *Dickerson,* 508 U.S. at 373, 113 S.Ct. at 2136, 124 L.Ed.2d 334. On the other hand, "if a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375, 113 S.Ct. at 2137, 124 L.Ed.2d 334. The rationale is that if an officer is legitimately conducting a *Terry* frisk, *no additional privacy interest is implicated by the seizure of an item whose identity is already plainly known through the officer's sense of touch.* *Id.* at 377, 113 S.Ct. at 2138, 124 L.Ed.2d 334.

... *Therefore, if the officer in the case before us realized that the bag in respondent's waistband was not a weapon, the search of respondent's property exceeded the permissible scope of a Terry frisk and the evidence should be suppressed.*

*In re David S.,* 367 Md. at 544–45, 789 A.2d 607 (emphasis added).

In the portion of the *Minnesota v. Dickerson* decision relied upon by the Court in the *David S.* case, the Supreme Court said:

If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; *if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.*

*Dickerson,* 508 U.S. at 375–76, 113 S.Ct. 2130 (emphasis added).

The "plain feel" arm of "the plain view" doctrine was explained in the *In re David S.* case, *viz:*

> The State argues that once Cpl. Segalman removed the bag and believed it to be a package containing drugs, the officer could seize it under the plain view doctrine. On the record before us, the plain view doctrine is not satisfied. The plain view doctrine of the Fourth Amendment requires that: (1) the police officer's initial intrusion must be lawful or the officer must otherwise properly be in a position from which he or she can view a particular area; (2) *the incriminating character of the evidence must be "immediately apparent;"* and (3) the officer must have a lawful right of access to the object itself. *Wengert v. State,* 364 Md. 76, 88–89, 771 A.2d 389, 396 (2001). We observed in *Wengert* that "[t]he requirement that an object's incriminating nature be 'immediately apparent' ensures that the 'plain view' doctrine is not used to engage in 'a general exploratory search from one object to another until something incriminating at last emerges.'" *Id.* at 89, 771 A.2d at 397 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). Construing the term "immediately apparent," we said:
>
> > " 'Immediately apparent,' however, does not mean that the officer must be nearly certain as to the criminal nature of the item. *Instead, 'immediately apparent' means that an officer must have probable cause to associate the object with criminal activity.*"
>
> *Wengert,* 364 Md. at 89, 771 A.2d at 397 (citations omitted). *See State v. Wilson,* 279 Md. 189, 195, 367 A.2d 1223, 1227 (1977) (prohibiting use of any evidence seized outside the warrant unless it is "immediately apparent to the police that they have evidence of crime before them").

367 Md. at 545, 789 A.2d 607 (emphasis added).

The State concedes that the key was not seized based upon the concern that it could be used as a weapon. Therefore, in

order for the seizure of the key to be within the scope of a permissible *Terry* frisk, the "incriminating character" of the key must have been "immediately apparent" to Trooper Grinnan before he extracted it. *Id.* Or, put another way, when the trooper felt the key, its seizure was legal only if he had probable cause to associate that key with criminal activity.

Trooper Grinnan admitted that he could not tell if the key he felt was for a motor vehicle; he simply knew it was a key of some sort. Except for coins, it is impossible to think of any object that an adult male is more likely to have in his pocket than a key of some sort. Under these circumstances, I would hold that Trooper Grinnan did not have probable cause, at the moment he felt the key, to believe that the key was associated with the crime he was investigating—or any other crime. Because the key was illegally seized, the key should have been suppressed, along with any testimony concerning that key.[17]

### *The Confession*

I agree with the majority's conclusion that appellant was not in police custody when he confessed to Trooper Grinnan and therefore the fact that he had not been advised of his *Miranda* rights was irrelevant.

The issue of whether Trooper Grinnan's remark ("It's funny, the key fits.") is the functional equivalent of interrogation

---

**17.** The "fruit of the poisonous tree" doctrine is an aspect of the exclusionary rule, a judicially imposed sanction for violations of the Fourth Amendment right against improper arrests and unreasonable searches and seizures in prosecutions, and requires courts to suppress evidence that is the product of unlawful governmental activity. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Ferguson v. State*, 301 Md. 542, 483 A.2d 1255 (1984).

*Pringle v. State*, 370 Md. 525, 547 n. 13, 805 A.2d 1016 (2002), *rev'd on other grounds*, —— U.S. ——, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

In this appeal, appellant failed to argue that his statements would be inadmissible as a fruit of the poisonous tree, but, at a minimum, that issue would provide food for thought, if the conviction were reversed— as I believe it should be. See *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.")

is a close question, but one that was unnecessary to decide. Therefore, I would not have decided it.

For the foregoing reasons, I would reverse the conviction and remand the case to the circuit court for retrial.